ORIENT INSURANCE COMPANY *v*. COX.

4-9469         238 S. W. 2d 757

Opinion delivered April 23, 1951.

*Lem C. Bryan* and *Warner & Warner,* for appellant.

*Franklin Wilder* and *Gutensohn & Ragon,* for appellee.

MINOR W. MILLWEE, Justice. This is an action on four separate fire insurance policies issued to appellee by the appellants covering the stock and fixtures of appellee's business at Fort Smith, Arkansas. The case was tried to a jury resulting in a verdict and judgment in favor of appellee for $8,195.71.

Appellee owns and operates an auto supply business specializing in sales and service of motorcycles and bicycles. On November 14, 1949, the local agents of appellants issued the four policies to appellee totaling $12,500. At that time appellee's business was located at 403 N. 18 Street in Fort Smith where he previously had a fire in January, 1949. Early in December, 1949, appellee moved to a new location on Towson Avenue and the policies were endorsed to show the new location with a rate increase from $1.35 to $1.89 per hundred. The building on Towson Avenue consisted of a brick showroom, 35 x 25 feet facing east, and a storeroom, 25 x 70 feet which extended west, with a connecting door to the showroom. The storeroom was constructed of sheet metal attached to 2 x 4 inch wooden studding with the exception of the south wall, which was constructed of concrete blocks and provided a dividing wall with an adjoining lumber company. The service department was located in the west end of the storeroom next to an alley.

Upon moving to the new location merchandise was placed in both the showroom and storeroom. During the last week in December appellee moved most of the merchandise to the storeroom. On Saturday, December 31, 1949, Bon Ami was placed on some of the windows of the building partially obstructing the view. On the same date about 6 p. m. appellee purchased ten gallons of gasoline at a nearby service station, six gallons being put in the tank of his automobile and four gallons were placed in a five-gallon can which he left in the service department of the storeroom. On Sunday, January 1, 1950, appellee purchased ten gallons of gasoline from another service station about 6 p. m., putting five gallons in his automobile tank and five gallons in a can in the back of his car.

Appellee testified that he went to his place of business on the evening of January 1, 1950. After writing some letters and moving the last of the merchandise from the display room to the storeroom, he drove his Cadillac automobile through the back door of the service department and worked on it for a while. He then went to a picture show by bus returning to his shop about 11 p. m. and resumed work on his car. He drained several gallons

of gasoline from the tank which were placed in jars, jugs, cans and bottles which he placed at various places in the building. Some of the containers were capped and some uncapped. A night watchman looked through a window of the storeroom at 12:46 a. m. and observed appellee working at his bench. He waved to appellee and the latter recognized the officer. Appellee left his place of business about 1 a. m. and walked about six blocks to Garrison Avenue where he took a taxi to his home.

A police patrol discovered appellee's place of business on fire at 2:11 a. m., January 2, and firemen arrived within a few minutes. In attempting to extinguish the blaze which was confined to the storeroom, the firemen counted several explosions and stated that burning gasoline floated out of the building on top of the water used to extinguish the flames. The fire was brought under control in about twenty minutes. After the fire was extinguished, firemen found about fifteen gallons of gasoline at different places in the building in eighteen or twenty jugs, jars and cans ranging in size from one quart, or less, to five gallons. Eight of the containers were uncapped.

Appellee was notified by telephone at his home and arrived at the scene after the fire had been extinguished. He was arrested at the scene for having excessive gasoline (more than five gallons) stored in his place in violation of a city ordinance and was later convicted and paid a fine on the charge. The fire department reported the cause of the fire as unknown.

Appellee testified that all of the merchandise was removed to the storeroom and service department preparatory for some remodeling to the showroom which he had arranged to have started on January 2, 1950. The contractor who was to do this work corroborated appellee's statement in this regard and testified that he requested appellee to remove all merchandise from the showroom.

Appellee also testified that he purchased the first ten gallons of gasoline on the evening of December 31, 1949, because a friend was having a formal opening of

his new service station and offering a premium with each ten gallons purchased; that he took the four gallons to his shop for use in the service department; that he purchased the extra five gallons on January 1, 1950, and took it to his home for use in cleaning paint brushes and other miscellaneous uses; that Bon Ami was placed on the windows for the purpose of cleaning them; that in working on his car on the night of January 1, he found sediment in the filter bowl which indicated there was dirt either in the fuel line or gasoline tank; that he did not test the fuel line, but decided to remove and clean the tank and proceeded to drain the gasoline from the tank using the only available containers for that purpose; that he thought it would be safer to scatter the containers at different places in the building than to have them all concentrated in one place; that he did not remove all of the gasoline from the tank and planned to finish the job when he returned to work later in the morning. He denied that he willfully or intentionally set fire to, or caused, the property to burn.

Appellants insist that the trial court erred in refusing to direct a verdict in their favor because they say the undisputed evidence shows that the fire was of incendiary origin, caused, procured or connived in by appellee in violation of law and the insurance contracts. In this connection it is urged that the undisputed evidence shows such gross negligence and recklessness on the part of appellee as to amount to fraud, as a matter of law, and preclude a recovery on the policies. The insured's willful burning of the property would, of course, be an absolute defense regardless of whether the policies contain an express provision to that effect. If there is a dispute in the evidence on the question of whether the fire is of an incendiary origin, caused or connived in by the insured, then that question is for the jury's determination. *Banker's Fire Ins. Co.* v. *Williams,* 176 Ark. 1188, 5 S. W. 2d 916; *North River Ins. Co. of N. Y.* v. *Loyd,* 180 Ark. 1030, 23 S. W. 2d 988.

The law generally on the question of gross negligence or recklessness is stated in Couch, Cyclopedia of Insurance Law, Vol. 6, § 1479, as follows: "As to whether or

not gross negligence or recklessness will evince such a fraudulent purpose as will release an insurer from liability, the authorities are not entirely agreed, although the weight thereof undoubtedly supports the affirmative. Thus, if an insured stands by, and, having means at hand to extinguish a fire or prevent it from spreading, negligently or carelessly permits it to burn, whereby the insured property is injured or destroyed, there is something more than mere negligence, for, if the insured has failed to exercise good faith and common honesty, there may be room for a fair inference of such gross negligence as evinces a fraudulent purpose or design; or, at least, such a willingness, that the question might arise whether the insurers could avail themselves of such acts as a defense. But in such cases all the surrounding circumstances ought to be fairly considered, for such acts, under the particular facts of a case, might not justify an inference of a willingness having the character of a fraudulent purpose or design, and the question should be fairly presented by the evidence, and be left to the jury, for there is a distinction between a mere omission to do a thing which a prudent person might have been expected to do, and a fraudulently and willfully negligent act. If, however, the negligence is so gross as to create or authorize a presumption of fraud, the insurer is not liable. In fact, while it is a well-established rule that losses occasioned by the mere fault and ordinary negligence of one holding a fire policy are within the protection of such policy, it is held that, notwithstanding this rule, gross negligence or recklessness on the part of the insured may preclude a recovery. Some cases, on the other hand, take the view that gross negligence will not avoid the risk, unless fraud be shown, or there be such a degree of negligence as evinces a corrupt design.''

The rule is stated in 5 Appleman, Insurance Law and Practice, § 3114, as follows: ''Negligence of the insured or his servants, not amounting to fraud, will not defeat recovery upon the policy though such negligence constitutes one of the direct and proximate causes of loss. Consequently, it is erroneous to charge that it was the insured's duty to exercise ordinary care to protect his

property from fire, and that where loss occurred as the direct result of negligence, the insured could not recover. On the other hand, the insurer is not liable for such reckless and inexcusable negligence as tends to show fraudulent purpose or design. This is particularly true where the consequences thereof must have been palpably obvious to the insured at the time, the court presuming under such circumstances that the results must have been intended.''

In *Beavers* v. *Security Mutual Insurance Co.*, 76 Ark. 595, 90 S. W. 13, this court approved the following statement from 2 May on Insurance, § 408, as the law on the subject: ''Mere carelessness and negligence, however great in degree, of the insured, or his tenants or servants, not amounting to fraud, though the direct cause of the fire, are covered by the policy. Indeed, one of the principal objects of insurance against fire is to guard against the negligence of servants and others; and, therefore, while it may be said generally that no one can recover compensation for an injury which is the result of his own negligence or want of care, the contract of insurance is excepted out of the general rule. Nor does it make any difference whether the negligence is that of the insured himself or of others.'' In *Home Insurance Co.* v. *Springdale Motor Co.*, 200 Ark. 893, 141 S. W. 2d 522, the court said: ''We have very recently held that something more than mere negligence on the part of the insured in causing a fire, or in failing to extinguish it, is required to exonerate the insurer from liability, and that there must be willfulness in one or the other of these respects before the insurer's liability is discharged. *Farmers' Union Mutual Ins. Co.* v. *Jordan*, 200 Ark. 711, 140 S. W. 2d 430.''

Appellants cite several chancery cases in which this court held that the finding of the trial court on the question as to whether the fire was of incendiary origin was either supported, or unsupported, by the preponderance of the evidence. The question here is not whether the verdict is supported by the preponderance of the evidence, but whether there is any substantial evidence to support it. Under all the facts and circumstances pre-

sented in evidence, we hold that the question whether the fire was of incendiary origin, caused or procured by appellee, and the question whether appellee was guilty of such gross negligence and recklessness as to show a fraudulent design, were properly for the jury, and there was no error in the court's refusal to direct a verdict for appellants.

The policies contain a provision excluding liability for loss occurring "while the hazard is increased by any means within the control or knowledge of the insured. . . ." It is insisted that the placing of more than fifteen gallons of gasoline at different places in the building amounted to such change in the use and condition of appellee's stock of merchandise as to violate this provision of the policies and bar a recovery by appellee as a matter of law, and that the trial court erred in refusing to so hold. In reference to this provision the general rule is stated in 29 Am. Jur., Insurance, § 677, as follows: "Such a provision is valid and enforceable and must be given a reasonable construction. It relates to a new use which would increase the risk or hazard of fire, and not to a continuation of a former or customary use, or to a change in risk without increase of hazard. It contemplates an alteration in the situation or circumstances affecting the risk which would materially and substantially enhance the hazard, as viewed by a person of ordinary intelligence, care, and diligence. The provision does not prohibit the owner from exercising the usual and ordinary acts of ownership, or exempt the insurer from liability resulting from the carelessness or negligence of the insured, unless it amounts to fraud or willful misconduct, or unless it is so continuous or of such a nature as to increase the hazard more or less permanently. While there is authority to the effect that the provision is broken by a temporary increase of risk which is caused by the manner of using the premises and which is not a casual, inadvertent, or inevitable thing, the general rule may be said to be that the provision applies to changes of a permanent nature, and not to mere temporary changes in the use of the premises."

In an extensive annotation to the case of *Angier* v. *Western Assurance Co.,* 10 S. D. 82, 71 N. W. 761, appearing in 66 Am. St. Rep. 695, numerous cases construing the provision in question are cited to the effect that a casual or temporary change in the use or condition of the insured property will not ordinarily be sufficient to avoid the policy. The Angier case involved a fire caused by insured's negligent use of kerosene and the court said: ''Undoubtedly, the use of the kerosene in the manner detailed by the witness was a careless and negligent act, but it was not such an act as is understood by the term 'increase of hazard.' The stipulation of the policy is that 'the entire policy . . . shall be void . . . if the hazard be increased by any means within the control or knowledge of the insured.' Keeping kerosene upon the premises in no manner violated the stipulations of the parties, and could not, therefore, be held to constitute an increase of the hazard, within the meaning of the policy. The term 'increase of hazard' denotes an alteration or change in the situation or condition of the property insured which tends to increase the risk. These words imply something of duration, and a casual change of a temporary character would not ordinarily render the policy void, under the stipulations therein contained. . . . In the case at bar, the contention of counsel for appellant that the use of kerosene oil at only one time, in the manner detailed, constituted an increase in the hazard, in the sense in which that term is used, in the policy, is not tenable.''

Another leading case on the question is *Nash* v. *American Insurance Co.,* 188 Iowa 127, 174 N. W. 378, 10 A. L. R. 724. It was there held that the starting of a temporary fire on the concrete floor of a silo by the insured was not within the provision. The court held that such clause in the insurance contract had reference to changes in the use, situation or exposure of the property permanent in their nature, saying: ''Nor does it include mere acts of negligence on his part, unless these are so continuous and of such a nature as to increase the hazard more or less permanently. It is to be presumed that the contract was entered into with reference to the

character of the property and the owner's use of it, and it would greatly impair the advantages of insurance were trivial or temporary variations permitted to defeat the contract." In Couch, Cyclopedia of Insurance Law, § 960, it is said: "Primarily, an increase of hazard is some alteration or change in the situation or condition of the property insured which tends to increase the risk, and ordinarily refers only to such hazards as result from physical changes in the insured property after the issuance of the policy. The term 'increase of hazard,' however, refers to an increase of either the physical or moral hazard. And 'moral hazard' has been defined as the risk, danger, or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance, and any change in the insured or the insured property that will increase the probability of such a destruction increases the moral hazard; as, for example, any act or change that increases the temptation to destroy, or any act that reduces the value of the property in proportion to the amount of insurance, or the procuring of insurance materially in excess of the reasonable cash value of the property. As a general rule, an increase of risk or hazard also infers something of duration, as distinguished from a casual change of a temporary character." In the same section it is also said that the increase of risk or hazard is a question for the jury, unless the evidence is so conclusive that reasonable minds cannot differ. In *Emery* v. *Lititz Mut. Ins. Co.,* 228 N. C. 532, 46 S. E. 2d 309, where the insured's testimony was equivocal on the issue of avoidance, or increased hazard within the meaning of the policy, the court held that the question as to whether the use which the insured was making of a barn increased the hazard should be submitted to the jury. See, also, *Pool* v. *Milwaukee Mechanics' Ins. Co.,* 91 Wis. 530, 65 N. W. 54.

Appellants rely on *Washington County Mutual Fire Ins. Co.* v. *Williams,* 202 Ark. 283, 150 S. W. 2d 44. It is true that the policy in that case contained the same clause as involved here. However, it also contained a clause specifically prohibiting the use of the insured property (hen house) as a brooder house except upon

special permit endorsed on the policy. It was found that the building was being used as a brooder house at the time of the fire, which was of incendiary origin, in violation of the specific prohibition against such use and not under the general "increase of hazard" clause. Appellants also cite many cases from other jurisdictions where recovery was denied because of a violation of an express provision in the policy prohibiting the keeping or use of highly inflammable substances on the premises. The policies in the case at bar contain no provision prohibiting the keeping of gasoline on the premises. The trial court in instructions 5 and 6 requested by appellee and instruction 22 requested by appellants correctly submitted the issue of increased hazard to jury.

The most serious question in the case relates to the giving of instructions Nos. 7 and 9 at the request of appellee. Instruction No. 7 was given as modified by inserting the words shown in italics, as follows: "You are instructed that defendants, insurance companies, have alleged in their answer that 'any fire that occurred or loss of said property by fire was of incendiary origin, caused, procured, and connived in by plaintiff in violation of law and said contracts and defendants plead same as bar to recovery.' In this regard, you are instructed that although circumstantial evidence is admissible, the burden of proof is upon defendants to show by a preponderance of the evidence that the said fire was of incendiary origin; it is not sufficient that it prove a mere suspicion of incendiarism, and the mere fact that plaintiff failed to account for the origin of the fire or that its origin is now unknown is not an incriminating circumstance, and in this regard you are further instructed that if the circumstances are as consistent with innocence as with guilt, they should be rejected and if such circumstances can be freed of the imputation of fraud or deliberate incendiary acts on the part of Cox, then and in that event you should disregard such circumstances unless you find from a preponderance of the evidence that the said Cox is guilty of the willful and fraudulent acts *or gross negligence or recklessness with regard to* incendiarism as alleged herein."

Appellee's requested instruction No. 9 was given, as modified by striking the words in italics, as follows: "You are instructed that there is no presumption that an unexplained fire is of incendiary origin. On the contrary the presumption is that such fire was caused by accident or at least that it was not of *criminal or* incendiary design; and so in this case it is your duty to consider this presumption under all the law and the evidence given to you in this case and before defendants, insurance companies, can rely upon the incendiary origin of this fire, the burden of proof is upon them to próve by a preponderance of the evidence that said fire was of incendiary origin and not by accidental means."

Appellants made numerous specific objections to the giving of instruction No. 7. It is argued that the instruction is abstract, misleading and prejudicial in that it employed language which is only applicable in criminal cases and invaded the province of the jury by commenting on the weight of the evidence. The well settled rule in this country in civil cases is that facts constituting a crime need not be proven beyond a reasonable doubt and only a preponderance of evidence is required to sustain a charge of arson made in defense of a suit on a fire insurance policy. Anno. 124 A. L. R. 1380. While instruction No. 7 declared that only a preponderance of evidence was required, there is other language used which applies the test in criminal cases where circumstantial evidence and the presumption of innocence are involved and proof beyond a reasonable doubt is required. This language was misleading in that it in fact had the effect of requiring more than a preponderance of the evidence to establish incendiarism. In directing the weight that should be given to certain circumstances it invaded the province of the jury and amounted to a comment upon the weight of the evidence in violation of the well settled rule.

Instruction No. 9 gave effect to a presumption that the fire was accidental where evidence had been introduced by appellants tending to rebut the presumption. Our cases generally follow the rule as stated in Wigmore, Evidence (2d Ed.), § 2491, as follows: "The peculiar

effect of a presumption 'of law' (that is, a real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule. . . . It is, therefore, a fallacy to attribute (as do some judges) an artificial probative force to a presumption, increasing for the jury the weight of the facts, even when the opponent has come forward with some evidence to the contrary." See *Ford & Son Sanitary Co.* v. *Ransom,* 213 Ark. 390, 210 S. W. 2d 508, and cases there cited which distinguish between presumptions of law and presumptions of fact. In *Union Central Life Ins. Co.* v. *Sims,* 208 Ark. 1069, 189 S. W. 2d 193, we also drew a distinction between statutory presumptions and presumptions founded upon the laws of nature and self-preservation, such as the presumption against suicide, and held that the latter would stand throughout the trial and until overcome by evidence which outweighs the presumption. The jury were required in instruction No. 9 to consider the presumption that the fire was accidental as evidence after the introduction of testimony to rebut it. We cannot agree with appellee's contention that the presumption involved here is of the character and strength of a presumption such as that against suicide. The language in instruction No. 9, "and so in this case it is your duty to consider this presumption under all the law and evidence given to you in this case . . ." gave effect to the presumption as evidence after rebutting evidence had been adduced and this was error.

The trial court was faced with the task of passing on some forty-four instructions requested by the parties, in a case where the issues were not particularly complicated. Several of the instructions requested by appellants were repetitious and there was no basis in the evidence to support others. In the rush of a jury trial this places a tremendous burden on the trial judge. We have examined the other assignments of error urged by appel-

lants in the giving or refusal to give certain instructions and the refusal to admit certain evidence, and find no merit in them. On account of errors indicated in the giving of instructions 7 and 9 requested by appellee, the judgment is reversed and the cause remanded for a new trial.

HOLT, J., not participating.