CHICAGO TITLE & TRUST COMPANY, Trustee, Plaintiff-Appellee, *v.* ILLINOIS FAIR PLAN ASSOCIATION, Defendant-Appellant.

First District (3rd Division)    No. 78-1674

Opinion filed December 1, 1980.

Clausen, Miller, Gorman, Caffery & Witous, of Chicago (James T. Ferrini and Frank L. Schneider, of counsel), for appellant.

Rabens, Formusa & Glassman, of Chicago (George C. Rabens, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Chicago Title & Trust Company, as land trustee, brought this action on behalf of a beneficial owner, Dr. Romeo Pallotto (hereinafter plaintiff), to recover insurance benefits under two fire insurance policies issued by defendant, Illinois Fair Plan Association. A jury returned a verdict for plaintiff in the sum of $39,500, and the trial court entered judgment on the verdict. The trial court denied defendant's post-trial motions for judgment notwithstanding the verdict and new trial. On appeal, defendant contends that plaintiff had no insurable interest in the properties; that coverage under the fire policies was suspended by an increase in fire hazard caused by means within the knowledge or control of plaintiff; that the trial court erred in refusing to submit special interrogatories to the jury; that the trial court erred in instructing the jury; and that the trial court applied an erroneous rule of damages.

Plaintiff was a beneficial owner of two separate buildings, sharing a common anterior, located at 4737-39 and 4741-43 South Prairie Avenue in Chicago. Each building was a three-storied brick structure containing six apartments. On January 10, 1972, plaintiff obtained two policies from defendant, one on each building. Each policy afforded coverage for "direct loss by fire" in the sum of $40,000.

Plaintiff's complaint alleged five claims for fire loss and charged that, since the losses were separate, the full $40,000 coverage was applicable to each loss. The complaint alleged that four fires occurred at 4737-39: September 23, 1972, resulting in $7,754.55 loss; October 1, 1972, in $4,078.22 loss; October 21, 1972, in $24,637.62 loss; and October 22, 1972, in $44,674.58 loss. One fire occurred at 4741-43, on October 29, 1972, and it resulted in an alleged loss of $6,014.05. Plaintiff alleged total damages in

the sum of $87,159.02. At trial, the following pertinent evidence was adduced.

The fire department had no record of a fire on September 23, 1972. The evidence of such fire was a report which was introduced into evidence by plaintiff. The report was prepared by a public adjuster who did not testify. It stated that the damage was confined to the basement apartment and consisted primarily of smoke damage. As to the fire of October 1, 1972, the fire chief testified from a report that the premises were vacant at that time. The fire of October 21, 1972, was substantial. The fire which occurred on October 29, 1972, which was the only fire occurring in 4741-43, was confined to one room. The fire department made no damage estimate because the premises were vacant.

In 1971, plaintiff became dissatisfied with the building management and hired the Edison Smiley Real Estate Company to manage the premises. Edison V. Smiley testified that when he was first hired he furnished plaintiff with monthly statements of income and disbursements. By summer 1972, income had become so reduced that he submitted one final statement covering July through September 1972. In June there were seven tenants and five vacancies. In July 1972, there was one paying tenant, Jack Coley. He paid his July rent and turned in his key in August. After July, there was no rental income. All the tenants had vacated by the end of September. In fact, Smiley did not know whether any tenant remained in September.

Smiley testified that in September 1972, the doors had been torn down. The building was open and no boarding-up was attempted. All windows were broken, all metal removed, and the heating plant was gone. He stated that one would be afraid to enter the building. He just tiptoed on the back porch because the vacant apartments were filled with vagrants. He stated, "that was not just a building."

Smiley described the final disbursements covering the operation of the buildings. The last electrical bill covered service up to August 2, 1972. The last water bill covered the period ending September 18, 1972. The garbage disposal service ended its service in August 1972. On October 1, 1972, Smiley paid Columbus Thigpen $30 to disconnect the water, gas and electricity. That was the last service to the building. The janitor had been discharged. On August 18, 1972, Smiley received a report from the City of Chicago which he forwarded to plaintiff. The report cited 15 building code violations and described the premises as vacant and unoccupied. It contained an order to repair the buildings or demolish them because of their unsafety.

Charles Baylom testified that he was assigned to the dangerous and hazardous building section of the City of Chicago department of buildings. He inspected the properties in question on October 18, 1972. The

buildings were open and vacant. The properties had been vandalized and stripped of all facilities. According to a building inspection report, all electrical, plumbing and heating fixtures and units were either broken or missing. Photographs taken by Baylom on October 18 were introduced into evidence as exhibits. The photographs disclosed that the premises were vacant and open. The City of Chicago demolished the buildings in 1973.

Lenora Brownridge and Freddie Mae Johnson testified that they had resided in the premises as tenants for approximately six years. There had been a fire in 1971 (not involved in this appeal), and after that fire, the premises had deteriorated rapidly. There was no heat and tenants had to bring in water because the plumbing was inoperative. The witnesses moved out of their apartments in early September 1972.

Nathan and Dorothy Smith testified that they lived next door to plaintiff's buildings. The buildings became vacant, abandoned, and were used by prostitutes and drug addicts. Pedestrians passing in front of the premises were attacked and robbed by persons hiding in the buildings. Several times Smith attempted to board up the front of the buildings with doors and scrap lumber for the protection of his family and persons passing the buildings.

Arthur C. Radek, a public fire adjuster and an independent insurance adjuster, testified that he investigated the fire losses and a vandalism claim on the two buildings. He first visited the premises on October 2, 1972, and described the buildings as being vacant, abandoned, open and exposed. The buildings were in a run down and dilapidated condition. By talking to neighbors and viewing the apartments from the rear porches, and by walking around he determined the buildings were unoccupied. He did not enter every room of each apartment to search for occupants. He noted that radiators and kitchen sinks were missing. In a telephone conversation with plaintiff a few days later, plaintiff informed Radek that the premises would be protected from further damage. On subsequent visits to the properties, Radek found the buildings unsecured and found no indication that any materials had been obtained or used to secure the buildings. Photographs taken by Radek on October 2 were introduced into evidence by defendant and indicated that the buildings were vacant and open.

Robert J. Steele testified that during the latter part of 1972, he was employed by plaintiff to maintain some apartment buildings. Sometime in October 1972, he visited the buildings and noticed fire damage. He did not enter the buildings and did not see any occupants. He boarded up the front entranceway, using a door and scrap lumber he found nearby. He did not go to the rear of the buildings. On two subsequent visits, he accompanied plaintiff and assisted in securing the building.

Plaintiff testified that he visited the premises on September 1, 1972. The buildings were livable, and the physical conditions were fairly good and solid. The buildings had seven tenants at that time. Plaintiff then left the country for a vacation and did not return until late September. After he received a telephone call from Smiley, plaintiff visited the premises in early October. Although he did not inspect the apartments, he believed that the buildings were still occupied. Plaintiff spoke to a tenant, Jack Coley. At a later visit, he saw drapes and curtains in both buildings. He contacted a private fire adjuster to assess the fire damage and to board up and secure the property. Plaintiff stated that he made every effort to close up those portions of the property which were damaged by fire.

Plaintiff observed the property after the fire of October 21 and noted the extensive fire and water damage to the 4737-39 building. Plaintiff testified that it was always his intention to maintain the buildings in the best possible condition. He had left unrepaired a third-floor apartment in 4741-43 which had been damaged in a 1971 fire. Although the buildings were not repaired after the fires in question, plaintiff earlier had planned to refurbish the properties and had initiated a discussion with a banker for a possible loan. He left on vacation before his plans could be implemented. He paid delinquent bills after the fires and continued to pay a personally guaranteed mortgage. Plaintiff had not hired a guard or a watchman to prevent further damages but was told by the former janitor that attempts would be made to keep children away from the buildings. Plaintiff stated that he did not abandon the properties.

On appeal, defendant has presented several contentions. Because of our view of the matter, we deem it necessary to address only the argument that coverage under the fire insurance policies was suspended by an increase in fire hazard caused by means within the control or knowledge of the insured, and that a directed verdict or judgment notwithstanding the verdict in favor of defendant should have been granted.

A verdict should be directed and judgment notwithstanding the verdict entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R. R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In making this determination, the trial court may not substitute its judgment for that of the jury as to the credibility of the witnesses nor may the court determine the preponderance of the evidence. *Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 355 N.E.2d 354; see *Prange v. Wallenburg* (1975), 27 Ill. App. 3d 618, 327 N.E.2d 450.

■■ Defendant's fire insurance policies covering plaintiff's buildings provided in relevant part:

"Conditions suspending or restricting insurance. Unless otherwise

> provided in writing added hereto [defendant] shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured; * * *."

The term increase of hazard denotes an alteration or change in the condition of the property which tends to increase the risk. (*Orient Ins. Co. v. Cox* (1951), 218 Ark. 804, 238 S.W.2d 757.) Ordinarily, whether the hazard has been increased is a question of fact for the jury. (*Cavin v. Charter Oak Fire Insurance Co.* (1978), 66 Ill. App. 3d 808, 384 N.E.2d 441.) It becomes a question of law when all reasonable minds would agree that, based on the evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, the judgment in favor of plaintiff would not be permitted to stand. (See *Pedrick.*) Such is the case here, where the evidence conclusively and overwhelmingly establishes that the tenants have moved, and the buildings were unoccupied, unguarded, abandoned, and open to trespass. (See, *e.g., Goldman v. Piedmont Fire Ins. Co.* (3d Cir. 1952), 198 F.2d 712; *Asbell v. Pearl Assurance Co.* (1960), 59 N.J. Super. 324, 157 A.2d 728; *Montello v. Manhattan Fire & Marine Ins. Co.* (1937), 250 App. Div. 610, 294 N.Y.S. 1015.) Such an increase in hazard must suspend coverage.

The record reveals that the buildings were abandoned, open and unguarded in September 1972. This evidence was established by the eyewitness testimony of neighbors, tenants, city employees, and plaintiff's building manager. That testimony was confirmed by photographs of the buildings and by plaintiff's business records covering the premises. What was revealed were not buildings but abandoned shells. The utilities and garbage disposal had been discontinued by August. No rent was received after July. According to the building manager, all tenants vacated the premises in September and they left buildings which were without doors or windows and no furnace. Before the tenants vacated the premises they had to bring in water because there was no plumbing. Next door neighbors testified that after the tenants moved out, the buildings were open and abandoned except to vagrants and criminals. According to the building manager, nothing was done in response to a notice from the city to repair or demolish the buildings because of their unsafety. Photographs of the buildings taken on October 2 reveal strikingly the accuracy of the testimony that the buildings were completely abandoned, unguarded and open. As aptly phrased by defendant, the question was not whether the buildings would burn, but when.

In the face of such overwhelming evidence, plaintiff offered only his own testimony that he believed tenants still resided on the premises on October 2 and of his intent to repair the buildings. As to his testimony about tenants, he conceded that he had not inspected the premises on October 2 when he visited. Plaintiff's intent to refurbish the buildings is

not pertinent to the condition of the buildings as it then existed. The evidence was conclusive that an increase in fire hazard had occurred and that the increase was caused by means within the control of plaintiff.

■■ The record also discloses that plaintiff had knowledge of the increased risk. He had received a copy of a report from the city building department setting forth the hazardous condition of the premises and ordering their repair or demolition. Despite his control and knowledge, plaintiff failed to take steps to abate the increased hazard of fire, thereby suspending coverage under the policies. The trial court erred in not directing a verdict or in not entering judgment notwithstanding the verdict in favor of defendant.

For the reasons stated, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

SIMON and RIZZI, JJ., concur.