222 N.J. Super. 281 (1988)
536 A.2d 787
INDUSTRIAL DEVELOPMENT ASSOCIATES A/K/A INDUSTRIAL DEVELOPMENT ASSOCIATION, PLAINTIFF-APPELLANT,
v.
COMMERCIAL UNION SURPLUS LINES INSURANCE COMPANY, EXECUTIVE EXCESS LTD., P.P.G. INDUSTRIES, INC., ANTONIO SUAREZ D/B/A ICP AND PUGLIESE SWIMMING POOLS CORPORATION, DEFENDANTS-RESPONDENTS, AND F.T.P., INC., DEFENDANT-RESPONDENT CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1987.
Reargued December 15, 1987.
Decided January 21, 1988.
*284 Before Judges PRESSLER, MUIR, Jr. and SKILLMAN.
Michael F. Chazkel argued the cause for appellant.
John S. Fitzpatrick argued the cause for respondent Executive Excess, Ltd. (Haggerty & Donohue, attorneys; John S. Fitzpatrick, on the brief).
Robert H. Tell argued the cause for respondent-cross-appellant F.T.P., Inc. (Lynch, Martin & Philibosian, attorneys; Robert H. Tell, of counsel and on the brief).
Brian C. Matthews argued the cause for respondent P.P.G. Industries, Inc. (Tompkins, McGuire & Wachenfeld, attorneys; Brian C. Matthews, of counsel and on the brief).
Susan M. Danielski argued the cause for respondent Commercial Union Surplus Lines Ins. Co. (Cozen and O'Connor, attorneys; Gerard Harney and Susan M. Danielski, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
This insurance litigation arises out of a fire which damaged several buildings in an industrial complex in Newark. Plaintiff Industrial Development Associates (Industrial) is a limited partnership formed in 1979 to acquire the industrial complex, which consisted of 22 buildings located on approximately 7 1/2 acres of land. Industrial's general partners are Anthony Pugliese, Jr. and his son, Anthony Pugliese, III. Anthony Pugliese, III (hereafter referred to as Pugliese) was responsible for supervising extensive renovations of the buildings in preparation for leasing them to commercial tenants. Pugliese, acting as agent for Industrial, hired Pugliese Swimming Pools Corp., also owned by the Puglieses, as the general contractor for the renovations, which included demolition, repairs of the plumbing, heating, and sprinkler systems, and a variety of other rehabilitative work.
*285 In July of 1980, when there were already tenants occupying some of the buildings, Pugliese attempted to obtain insurance on six of the buildings through Anthony Suarez, an insurance broker with whom he had previously done business in connection with other renovation projects. Unable to secure coverage in the conventional marketplace, Suarez contacted Thomas Guthrie of F.T.P., Inc. (FTP), also an insurance broker, to obtain his assistance in securing coverage from a surplus lines insurer. Around August or September of 1980, Suarez visited the premises for approximately one-half hour, accompanied by Guthrie. Pugliese alleges that during this inspection he informed Guthrie, who is now deceased, that the sprinkler system in the buildings was disconnected. Guthrie, in the part of his deposition read to the jury, denied being told this. Guthrie subsequently contacted Michael Himowitz of defendant Executive Excess (Executive), another insurance broker, who in turn communicated with Thaxter H. Polk of defendant Commercial Union (Commercial), a surplus lines insurer. According to Himowitz, Guthrie informed him that the sprinkler system was operational and he passed on this information to Commercial. Polk then gave Himowitz the order to bind the coverage.
A binder dated August 28, 1980 was issued by FTP and signed by its President, Frank Powell. This binder identified Suarez's company as the broker for Industrial and Commercial as the insurer. Powell apparently received an oral authorization from Executive to issue this binder. Himowitz sent Guthrie a confirmation of insurance, dated October 9, 1980, which indicated that coverage had become effective on September 5, 1980. A policy of insurance was subsequently issued by Commercial.
On March 18, 1981, a serious fire erupted during renovations when an acetylene torch being used to remove piping came in contact with chemical residue in the pipes. Industrial filed a claim with Commercial for the losses it incurred in the fire. Commercial rejected the claim on the grounds that the inoperability *286 of the sprinkler system on the date of the fire constituted a violation by Industrial of the Automatic Sprinkler clause of the Protective Safeguards Endorsement of the policy. This endorsement warranted that the premises were protected by a sprinkler system and imposed an obligation upon Industrial to immediately notify Commercial of any impairment of the system.
On March 21, 1984, Industrial filed this lawsuit against Suarez,[1] FTP, Executive and Commercial based on the rejection of its insurance claim. Industrial also named the renovations contractor, Pugliese Swimming Pools, as a defendant, alleging that its negligence in performing the renovations had caused the fire. Additionally, a former owner of the property, PPG Industries, Inc. (PPG), was joined as a defendant on the theory that its negligence in leaving chemical paint residues in the pipes when it sold the property had been a contributing cause of the fire.
On January 10, 1986, Commercial and Executive successfully moved for summary judgment on the grounds that the undisputed facts showed that Industrial had breached the Protective Safeguards Endorsement of the policy by failing to have an operational sprinkler system as of the date of the fire. The trial court acknowledged the existence of a factual dispute as to whether Guthrie had been informed that the sprinkler system was inoperative. However, the court concluded that Commercial and Executive could not be held responsible for Guthrie's failure to notify them that the premises did not have sprinklers, because it had been established as a matter of law that Guthrie's employer, FTP, was not acting as an agent for Commercial and Executive.
The case subsequently proceeded to trial against FTP, PPG and Pugliese Swimming Pools. Industrial settled with Pugliese *287 Swimming Pools during trial. At the close of Industrial's case, the trial court granted motions by FTP and PPG for dismissal. Industrial appeals and FTP cross-appeals from the summary judgments in favor of Commercial and Executive. We reverse the dismissal at the close of Industrial's case entered in favor of FTP and the summary judgments in favor of Commercial and Executive. We affirm the dismissal of PPG.

I
Commercial and Executive were granted summary judgment based on the trial court's conclusion that Industrial had breached its obligations under the Automatic Sprinkler clause of Protective Safeguards Endorsement of the policy, thereby suspending coverage as of the date of the fire. The relevant portion of this endorsement provides as follows:
In consideration of the premium at which this policy is written, based on the protection of the premises by the sprinkler system and in connection therewith an approved central sprinkler supervisory service, it is a condition of this policy that the insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of the approved central sprinkler supervisory service which are under the control of the insured. The insured shall give immediate notice to this Company of any impairment in or suspension of the sprinkler system or services (within the knowledge of the insured).
In arguing that Industrial breached this provision, Commercial and Executive rely on the undisputed fact that the sprinkler system had been disconnected for a substantial period of time prior to the fire. Industrial's position is that Commercial and Executive are estopped from relying upon the Protective Safeguards Endorsement because their agent, Guthrie, was aware when he bound the policy that the sprinkler system had been disconnected in connection with renovations on the buildings. See Harr v. Allstate Ins. Co., 54 N.J. 287 (1969). The response of Commercial and Executive is that Guthrie and his employer, FTP, were not their agents but rather Industrial's agents.
The issue on which the grant of summary judgment in favor of Commercial and Executive turns is whether FTP, an intermediary *288 in the placement of the policy insuring Industrial's premises, was acting as the agent of the insured, Industrial, or the insurer, Commercial. According to a leading commentator in the field of insurance, "... it is clear that this is a question of fact ..." and "[h]ence it is to be determined from all the facts of each case, and not from the mere words used, whether the agent represented the insurer or insured, or whether he acted for both." W.R. Vance, Handbook on the Law of Insurance (3 ed. 1976), at 435; see also 3 Couch, Insurance (2 ed. 1984) § 26.29 at 562. The decisions in this state have also recognized that the status of an insurance agent as agent of the insured or of the insurer "... depends upon the intention of the parties and is a question of fact to be determined by the jury." Higgins v. Fidelity-Phoenix Fire Ins. Co. of N.Y., 107 N.J.L. 175, 177 (E. & A. 1930); see also Lilly v. Allstate Ins. Co., 218 N.J. Super. 313, 322 (App.Div. 1987).
The relationship among the Industrial, Commercial and the three intermediaries involved in the placement of the policy on Industrial's premises was governed by the New Jersey Surplus Lines Law, N.J.S.A. 17:22-6.40, et seq. The purpose of this law is to regulate the placement of insurance with companies which are not authorized to directly transact business with prospective insurers in New Jersey, commonly called surplus lines insurers. See Railroad Roofing, etc., Co. v. Financial Fire & Casualty Co., 85 N.J. 384, 389 (1981). The primary means adopted by the Legislature for regulating this business is to require surplus lines insurers to conduct their business through surplus lines agents who are licensed by the State. N.J.S.A. 17:22-6.42(c). "New Jersey's requirement that surplus lines insurers receive all business through surplus lines agents represents a compromise affording New Jersey residents the in-state availability of this coverage when needed, while at the same time protecting state residents from direct solicitation by these relatively unregulated insurers." Evanston Ins. Co., Inc. v. Merin, 598 F. Supp. 1290, 1298 (D.N.J. 1984). Thus, Commercial, as a surplus lines insurer, could only conduct business in *289 New Jersey through a licensed surplus lines agent acting on its behalf.
Suarez was not licensed as a surplus lines agent, and Industrial admits that he acted as its agent in obtaining the policy with Commercial. However, both Executive and FTP were licensed as surplus lines agents in New Jersey. Industrial's position is that Executive dealt with Industrial's agent, Suarez, through FTP. Hence, Industrial argues that FTP was acting as Executive's agent and as Commercial's subagent in extending coverage on Industrial's premises. Commercial's position is that it dealt only with Executive in connection with the Industrial policy. Hence, it argues that if it had any agent at all in writing this coverage, it was solely Executive.
We are satisfied that extending all reasonable inferences in favor of Industrial, there exist factual issues as to whether FTP was acting as an agent for Commercial and Executive in the placement of coverage on Industrial's property. There is evidence that Guthrie conveyed the impression to Industrial that he was acting as Commercial's agent. Industrial's broker, Suarez, testified in depositions that Guthrie was "representing the insurance company," which it could be inferred was a reference to Commercial. Pugliese also testified that his impression, derived from either Suarez or Guthrie, was that Guthrie was representing the insurer.
Moreover, there was evidence from which it could be inferred that Commercial and Executive expressly or impliedly authorized FTP to act as their agent in connection with this transaction. Under N.J.S.A. 17:22-6.50, the surplus lines agent has the responsibility to "... promptly issue and deliver to the insured evidence of the insurance...." FTP was the agent which issued a binder to Industrial on August 28, 1980, shortly after Guthrie visited the premises and Commercial decided to write the coverage. This binder listed Associated Financial Services (Suarez's company) as Industrial's broker and included FTP's identification number as a surplus lines agent. In our opinion, this document would support an inference that FTP *290 was acting as the agent for Commercial and Executive in providing coverage to Industrial.[2] In fact, even in the absence of a statutory mandate such as N.J.S.A. 17:22-6.50 requiring the insurer's agent to issue a certificate of insurance, we have concluded that the issuance of a certificate of insurance is evidence that a party is the insurer's agent or, in the alternative, that the insurer is bound by that party's acts under the doctrine of apparent agency or agency by estoppel. Mattia v. Northern Ins. Co. of New York, 35 N.J. Super. 503, 512-513 (App.Div. 1955); see also Cheshansky v. Merchants' Fire Ins. Co., 102 N.J.L. 414, 417 (E. & A. 1926).
Accordingly, we conclude that the summary judgments in favor of Commercial and Executive must be reversed.[3]

II
Industrial's theory of liability against FTP at trial was that FTP had breached its duty of care as the broker for *291 Industrial by failing to procure a policy which would provide coverage even though the sprinkler system was disconnected.[4] FTP did not dispute the existence of evidence that its employee, Guthrie, had been informed that the sprinkler system was disconnected, and that this evidence would present a jury question as to whether FTP breached its duty to exercise reasonable skill, care and diligence in procuring the proper coverage for its insured. See Bates v. Gambino, 72 N.J. 219, 224-225 (1977). However, FTP asserted that even if the policy had been written without the Protective Safeguards Endorsement requiring maintenance of a sprinkler system, Industrial could not recover because it had breached the "increase of hazards" provision of the policy by permitting the use of the acetylene torch which caused the fire. Therefore, FTP argued that it could not be held liable, because its negligence, if any, was not the proximate cause of Industrial's lack of coverage for the fire.
The "increase of hazards" clause provides:
[T]his company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured;
This standard clause of a basic fire insurance policy is mandated by statute, N.J.S.A. 17:36-5.20. Such increase of hazards clauses have been the subject of interpretation in numerous decisions in this state and in other jurisdictions. See, e.g., Goldman v. Piedmont Fire Ins. Co., 198 F.2d 712 (3rd Cir.1952); Asbell v. Pearl Assurance Co., 59 N.J. Super. 324 (App. Div. 1960); Orient Ins. Co. v. Cox, 218 Ark. 804, 238 S.W.2d 757 (1951); see generally 8 Couch, Insurance (2 ed. 1984) § 37A:273 et seq. "An increase in hazard takes place when a *292 new use is made of the insured property, or when its physical condition is changed from that which existed when the policy was written, and the new use or changed condition increases the risk assumed by the insurer." Couch, supra, § 37A:291 at 329. An increase of hazard will generally not be found if there has been merely "... a casual change of a temporary character." Id. at 330. Thus, the negligence of the insured does not constitute an increase in the hazard, unless that negligence results in a change of some duration in the structure, use or occupancy of the premises. Orient Ins. Co. v. Cox, supra, 238 S.W.2d at 761-762; Couch, supra, § 37A:280 at 316. Whether there has been an increase of hazard suspending coverage under a policy is a question of fact which should be determined by a jury unless the evidence is so conclusive that reasonable minds could not differ. Orient Ins. Co. v. Cox, supra, 238 S.W.2d at 762; Couch, supra, § 37A:302 at 346. Moreover, the insurer bears the burden of proving that the insured has increased the hazard. Couch, supra, at § 37A:305 at 352.
At the close of Industrial's case the trial court concluded that the undisputed facts established Industrial's breach of the increase of hazards clause and therefore it dismissed Industrial's claim against FTP. The trial court made the following findings of fact and conclusions of law in support of this dismissal:
There is absolutely no question in this case that the acetylene torch, the use of the acetylene torch, was the cause of the fire, and there's absolutely no question in this case that the acetylene torch was used in a negligent manner.
* * * * * * * *
Factually, of course, it is beyond question that the use of the acetylene torch increased the hazard. It is beyond question that the owner, in the person of Pugliese, III, who was the operative head of both the owner and the contractor, knew that increased the hazard.
The only question is whether this transitory passage of an increased hazard comes within the terms of the policy provisions and where the burden of proof on this lies.
Insofar as burden of proof is concerned, I think the problem is without substance.... Where the positions of both plaintiff and the defendant have agreed that the acetylene torch was used in violation of all applicable Codes, all *293 applicable practices, there is absolutely no dispute. Neither side has contended that there was not a negligent practice in the manner in which the torch was used.
So to say that this has to be passed upon by the jury is, I think to take a position which is completely untenable. I don't think a jury could possibly find that it was used not negligently.
* * * * * * * *
Now, the only question is was that risk the risk which existed at the time the policy was issued in September of 1980?
The only evidence we have on that is that Guthrie inspected the building at the time. It was a half-hour inspection. He knew there were alterations in progress. There is nothing at all to indicate  at that time to indicate that an acetylene torch was being used in that building or in Buildings 4 and 5 where the fire occurred, and there is absolutely nothing to indicate an acetylene torch was used in buildings 4 and 5 prior to December 1980.
Now, Mr. Chazkel argues that acetylene torches were used in other buildings on the tract. There were approximately 21 or 22 buildings in the tract but, of course, that was not apparent to Guthrie at the time because the alterations had been completed or, so far as we know, virtually completed in the other buildings, and there is not any indication at all that Guthrie knew of the possibility of the use of an acetylene torch without appropriate safeguards at that time.
Under the circumstances, I think the appropriate interpretation of the policy is that contended for by counsel for FTP and, therefore, I grant the motion.
The trial court erred in a number of respects in concluding that FTP had conclusively demonstrated through the evidence presented during Industrial's case that Industrial had violated the increase of hazards clause of its policy. First of all, a plaintiff is not required during its case in chief to anticipate an affirmative defense and to present responsive evidence. Wyatt by Caldwell v. Wyatt, 217 N.J. Super. 580, 590 (App.Div. 1987). Consequently, in the absence of a stipulation that Industrial had no additional evidence to present relevant to the defense of a breach of the increase of hazards clause, the trial court should not have granted the motion to dismiss at the close of Industrial's case. See Advance Piece Dye Works v. Traveler's Indemn. Co., 64 N.J. Super. 405, 414-415 (App.Div. 1960).
Moreover, even if the evidence presented during the Industrial's case were the only evidence, the issue of Industrial's *294 breach of the increase of hazards clause should not have been taken from the jury. It is true that Pugliese testified during a part of his deposition read to the jury that the welder, Hines, had begun working at the premises only 3 or 4 months prior to the occurrence of the fire on March 18, 1981, which would have been subsequent to the inception of the policy. However, this part of Pugliese's trial testimony was vague.
Q. [FTP's counsel]: I think you told us in the depositions that prior to the date of the fire, he had actually been in the employ of Pugliese Swimming Pools about 3 or 4 months?
A. [Pugliese]: Something like that.
On the other hand, Thomas Caruso, a supervisor of the project, testified that Hines began working shortly after he himself had started work in the fall of 1979. In addition, Pugliese testified that acetylene torches were used as soon as renovation work inside the interiors of the buildings was begun, and Caruso testified that interior renovation work was being done on the buildings for an 8 to 10 month period preceding the date of the fire. Caruso also testified that he and two other persons besides Hines did some work with an acetylene torch during the renovation project. The jury could have concluded from this testimony that some pipecutting involving the use of an acetylene torch was occurring at the time of the inception of the policy.
Finally, insofar as the trial court's dismissal of Industrial's claim against FTP rests on findings of Industrial's negligence, it misconstrued the increase of hazards clause of the policy. An insured does not violate such a provision simply by virtue of its own negligence or that of its agent. Rather, it is only a change in the condition or use of the premises which will defeat an insured's claim under an increase of hazards clause of a policy. If there is an increase of the hazard, there is no need to show that it was caused by the insured's negligence, only that it was "within the control or knowledge of the insured." Conversely, if the insured is negligent but the essential condition and use of the premises remains the same on the date of a *295 loss as at the inception of the policy, there is no violation of an increase of hazards clause. Orient Ins. Co. v. Cox, supra, 238 S.W.2d at 761-762.
Therefore, we conclude that the judgment in favor of FTP must be reversed.

III
Industrial alleged that PPG had been negligent in not emptying its pipes of all chemical residue before transferring title to the premises in 1971, approximately 10 years before the fire. The trial court concluded that this claim was governed by section 353 of the Restatement of Torts, which provides in pertinent part:
A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves an unreasonable risk to persons on the land is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee or physical harm caused by the condition after the vendee has taken possession if (a) the vendee does not know or have reason to know of the condition or the risk involved. Restatement, Torts 2d, § 353 at 235 (1965).
The trial court further concluded that Industrial "knew or had reason to know" of the presence of chemical residue in its pipes prior to the fire and hence that its claim against PPG was barred.
Industrial does not dispute that section 353 sets forth the governing standard of liability applicable to PPG, as a former owner of the premises. See O'Connor v. Abraham Altus, 67 N.J. 106, 114-115 (1975). However, Industrial argues that there was conflicting evidence as to whether it was aware of the presence of large amounts of chemical residue in its pipes which could cause a serious fire.
We reject this argument and affirm the dismissal of Industrial's claim against PPG substantially for the reasons stated by the trial court. We note in particular that there had been approximately 20 small fires caused by the contact of acetylene torches with the piping system prior to the major fire on which Industrial's claim rests. Pugliese, as the representative of *296 Industrial, was aware of many of these fires and was thereby put on notice of the existence of flammable materials in the pipes. Even if Pugliese was unaware of the quantity of chemical residue in the pipes, the prior fires provided him with sufficient knowledge of the condition of his premises to alert him to the need to determine the magnitude of the problem. Cf. O'Connor v. Abraham Altus, supra; see also Restatement, Torts 2d, § 353(2) (1965). Accordingly, the record provides ample support for the trial court's finding that Pugliese "knew or had reason to know of the condition or the risks involved." In addition, Industrial failed to present any evidence that PPG failed to disclose whatever it knew about the chemical residue in the pipes to its vendee, which was a predecessor in title of Industrial. Therefore, we affirm the trial court's dismissal of the complaint against PPG.

IV
Industrial also argues that the trial court erred in excluding the testimony of its damage expert, Ira Sarasohn, as to the actual cash value of the buildings at the time of the loss. Since the trial court granted motions for dismissal at the close of Industrial's case based solely on its conclusion that Industrial's liability proofs were inadequate, this appeal could be decided without considering the exclusion of Sarasohn's testimony. However, since the judgments in favor of Commercial, Executive and FTP must be reversed and the case retried, and counsel for Industrial advised us at oral argument that he intends to offer Sarasohn's testimony again at the retrial, it is appropriate to provide some guidance with respect to the admissibility of this testimony.
The trial court apparently excluded Sarasohn's testimony on the grounds that his opinion would be based substantially on information furnished to him by other persons. However, a person otherwise qualified as an expert may utilize information *297 furnished to him by others in forming an opinion. Evidence Rule 56(2) now provides in pertinent part:
The facts or data in the particular case upon which an expert bases an opinion or inference may be ... made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
We note that the present formulation of this rule, which became effective in 1982, "... was adopted to `allow more latitude in the admission of expert opinion testimony' without being inconsistent with the `spirit' of the old rule." Evid.R. 56 (Anno. 1987), Comment 7 at 443; see also Olesak v. Central Mutual Ins. Co., 215 N.J. Super. 155, 158 (App.Div. 1987). If Sarasohn's testimony concerning the cash value of the building at the time of the loss is offered again at the retrial, its admissibility should be determined in light of the portion of Rule 56(2) quoted above.
Accordingly, the dismissal of Industrial's claim against PPG is affirmed. The dismissal of Industrial's claim against FTP and the summary judgments granted in favor of Commercial and Executive are reversed and the case is remanded for a new trial as to these defendants.
NOTES
[1] Suarez lacked any insurance coverage for Industrial's claim and, according to Industrial's counsel, he is judgment proof. Hence, Industrial decided not to pursue its claim against him.
[2] Pursuant to N.J.S.A. 17:22-6.42(e), which was added to the Surplus Lines Law by chapter 250 of the Laws of 1981 and became effective on August 6, 1981, a surplus lines agent may not exercise binding authority on behalf of a surplus lines insurer until the Commissioner of Insurance "... has approved the written agreement between the agent and the insurer setting forth the terms, conditions and limitations governing the exercise of the binding authority by the agent." Since this provision did not become effective until after Commercial provided coverage to Industrial, it has no applicability to this case.
[3] Industrial also presented three other arguments to support a reversal of the summary judgments in favor of Commercial and Executive: (1) Commercial is estopped from denying coverage because it failed to make a timely inspection of the premises which would have disclosed that the sprinkler system was inoperative; (2) the Protective Safeguard Endorsement was not a warranty but rather a condition of the policy, and coverage cannot be forfeited for breach of a condition absent a showing of appreciable prejudice to the insurer, which Commercial failed to establish; and (3) the Protective Safeguards Endorsement was ineffective because it was not mentioned in the binder issued to Industrial. Since a reversal of the summary judgments in favor of Commercial and Executive is required in any event because of the existence of factual issues regarding the status of F.T.P. and Guthrie as alleged agents of Commercial and Executive, we find it unnecessary to deal with these alternative arguments.
[4] Before trial, Industrial also proceeded against FTP on the alternative theory that FTP, acting as Commercial's agent, was estopped from relying on the Protective Safeguards Endorsement of the policy. However, Industrial properly considered this theory of liability to be foreclosed by the trial court's finding, in granting summary judgment to Commercial and Excess, that FTP had not acted as their agent. Since we have reversed the grant of summary judgment in favor of Commercial and Executive, Industrial will be entitled on remand to proceed on this alternative theory.