WILLIAM H. BRIGHTON, PLAINTIFF, v. NORTH RIVER INSURANCE COMPANY, DEFENDANT.

Argued January 17, 1929—Decided October 14, 1929.

Before GUMMERE, CHIEF JUSTICE, and Justice PARKER.

For the plaintiff, *Arthur M. Birdsall.*

For the defendant, *Arthur T. Vanderbilt.*

The opinion of the court was delivered by

PARKER, J.   This is a suit on a fire insurance policy, after a loss.   The company defended on a number of grounds, but those now relied on after a verdict for the plaintiff, are, in support of the claim that the court should have granted a motion to nonsuit, (1) concealment by insured of a material fact; (2) increase of hazard; (3) breach of warranty in the description of the property.   The same three grounds are invoked to support the proposition that the verdict was against the weight of evidence.

There seems to be little dispute about the facts.   Some months before the policy in suit was written, the plaintiff bought the property, an old farm for the clay topsoil and the sand subsoil, and agreed with the former owner that he might continue to live in the house till the following April. The barn and other outbuildings were torn down, and plaintiff began to excavate all around the house, cutting down eight or ten feet close to the house, and thus leaving it up in the air.   He was at first undecided whether to tear it down, but concluded to move it a few feet away and let it stand; he dug a hole for the new cellar, and contracted orally with a house mover, who went so far as to punch holes in the foundation and insert the cross girders under the frame part preparatory to shoring up and moving.   All this was unknown to Holmes, the defendant's agent, who had the regular insurance on plaintiff's properties and was accustomed to renew policies as they expired, in the ordinary manner. Holmes did know the plaintiff was uncertain whether he wished to renew the insurance on the house in view of possibly tearing it down, and the existing policy was allowed

to run out on June 5th. Later, about July 25th, Holmes concluded to inquire what plaintiff was going to do about it, and left word at plaintiff's office, and in a day or so plaintiff called on Holmes and said he would make the house livable for his foreman on the property, and to insure for $1,500; and Holmes said: "All right you are covered from now on;" and turned to his young woman clerk and told her to write the policy. It did not occur to Holmes to ask about the condition of the property, with which he was generally acquainted; nor did it occur to plaintiff to mention the fact, no doubt inconsequential to him that the house was in preparation for moving and that timbers were under it; or that it was not only unoccupied, but vacant, the previous tenant having moved out. The policy was written, but there were post office delays about getting it delivered, so that when finally Holmes handed it to plaintiff he was astonished to hear that the house had burned down a day or two before, after the policy had been written and charged up to plaintiff on Holmes' books, at a premium which defendant claims was about one-thirteenth of its standard rate for a building in that condition.

We do not think the defense of concealment was one for the court to take from the jury, or one which the jury plainly decided wrongly. The accredited definition of concealment is that it is the designed and intentional withholding of a fact material to the risk, which the assured in honesty and good faith ought to communicate. 26 C. J. 156. As to the house being vacant and unoccupied, the agent knew that. As to its being prepared for moving, the evidence is not clear whether it had been raised from the foundation or only that holes had been made in the latter and timbers inserted therein. Whatever the condition, there was no concealment of it, for the house stood out in the open for anyone to view, and if the agent himself, as he in effect testified, did not know that this worked an increase of risk, it is difficult to see how plaintiff should be charged with knowledge of that, and thereby laid under a duty to communicate it. This is not the case of suppressing the fact that a building had been officially

condemned, or that an attempt had been made to burn it as in cases cited for the rule; it is the case of a physical situation patent to all men at a glance, and which plaintiff omitted to mention, as the jury might properly find, because he was not in the insurance business and was ignorant of the increased risk which the experience of insurers has shown to be attached to a building in that condition.

Similarly as to the clause voiding the policy for increase of hazard. That clause relates to increase of hazard during the term of the policy, and there was no such increase, for the building had been prepared for moving before the policy was ordered and while there was no insurance thereon. The prior policy had expired June 5th; the fire occurred on July 31st; the moving contract had been made some three weeks before the fire. It is urged that the policy in suit was a renewal of former policies and therefore the increase of hazard rule should apply. But we think this is plainly without substance; and on this phase of the case it is sufficient to point out that the former policy was in a different company and that this defendant was insuring the property for the first time.

Finally it is urged that the case fails because the policy insured the house "while occupied exclusively for dwelling purposes by not exceeding two families." If this were all the point would doubtless be well taken; but it is not all. The rider contains a "privilege * * * to remain unoccupied not exceeding eight consecutive months at any one time in any one year; to remain vacant during any change of tenant or while awaiting a tenant not exceeding sixty consecutive days at any one time in any one year," &c. This seems quite enough to negative the effect of the occupancy warranty under the conditions stated above.

The nub of the case from the practical standpoint seems to be that the company accepted a manifestly insufficient premium because it took no pains whatever to inspect prospective risks in this locality; nor was there any systematic questionnaire imposed on its agents. The agent was merely asked whether the risk had his personal endorsement, moral or physical, and whether it was within five hundred feet of a

public hydrant. Consequently, the company failed to learn, in taking an entirely new risk, what the most casual inspection would have disclosed, and what the plaintiff would without doubt have stated fully and freely if he had been asked, or had known the conditions were material to the insurer as a basis of assuming the risk or of fixing the premium.

We find no judicial error, nor any disregard of duty on the part of the jury; and the rule to show cause will therefore be discharged.