JOHN GUZZI, PLAINTIFF - RESPONDENT, v. JERSEY CENTRAL POWER AND LIGHT COMPANY, A BODY CORPORATE, DEFENDANT-APPELLANT.

Argued March 30, 1953—Decided April 27, 1953.

*Mr. Isidor Kalisch* argued the cause for appellant (*Mr. Harry Lane, Jr.*, of counsel; *Messrs. Autenrieth & Rochester*, attorneys).

*Mr. Robert H. Maida* argued the cause for respondent (*Messrs. Parsons, Labrecque, Canzona & Combs*, attorneys).

The opinion of the court was delivered by

HEHER, J. The action is in tort for negligence. There was a jury verdict for plaintiff, and the consequent judgment was affirmed by the Appellate Division of the Superior Court. 20 *N. J. Super.* 296 (1952).

The complaint is in two counts: the gravamen of the first is the escape and explosion of illuminating gas in plaintiff's dwelling house at 1002 Broadway in West Long Branch, New Jersey, through the faulty maintenance and operation of the house supply line used as a part of defendant's gas distribu-

tion system, whereby the house and contents were destroyed; and the second charges want of due care to avert the danger after notice of the break in the supply line.

This is the situation of fact:

On October 2, 1950, before leaving with his wife for Atlantic City for a stay of several days, plaintiff shut off the flow of gas by turning with a .wrench the stopcock on the cellar supply line, following, so he said, printed instructions on the water heater to "Turn off gas at the meter first." When they returned home on October 6, at about 4:25 P. M., plaintiff first switched on the oil burner and then applied the self-same wrench to the stopcock in an endeavor to restore the gas supply, but on the turn the stopcock "broke off" and there was a breach in the gas line which plaintiff could not close. Defendant was given immediate notice of the emergency by telephone, and there was assurance of prompt protective measures. The explosion occurred before the arrival of defendant's emergency crew. The evidence is in conflict as to the time intervening between the notice to defendant and the explosion. Of this, more hereafter.

Plaintiff purchased the premises in December 1945, and entered into possession in April 1946. Gas service to the dwelling house had been provided by defendant for more than 20 years, by a medium pressure main in the street through an inch and a half pipe to the house and a three-quarter-inch pipe into the meter and thence into the house piping, controlled by the stopcock placed near the meter. Defendant made the service connection for plaintiff on March 29, 1946. In the application for the service and the necessary meter connection, plaintiff agreed "to use same in accordance with authorized Rate Schedules on file." Thereafter, there was a continuous supply of gas "without complaint" until the mishap at issue; and during the intervening period plaintiff, so he testified, on three occasions shut off and restored the gas flow without incident by the very means employed on the occasion in question when the valve "blew out." Plaintiff said that in each instance the wrench "turned freely and easily." But defendant insists

that "shiny marks" found on the valve itself indicated the application of undue force.

A witness of special experience in the field, Forstall, voiced the opinion that the escaped gas was ignited by a spark from the relay switch on the refrigerator. There was no evidence *contra*. And he testified that the stopcock in question "is not the type used by the well-regulated companies with which I am acquainted." Again, he said he was "familiar with the kind of equipment" used by well-regulated gas utility companies; "Whether it is standard or not, I don't know, but it is the kind that is used by the well-regulated companies,"—a "type in which the core is made solid and then the opening drilled through or else the opening is cast in that it doesn't leave the core with just a thin wall. The core has a heavier wall than the wall on that particular cock." The witness continued:

"Q. And then I ask you, is this stopcock of that kind? And I refer to the stopcock on Exhibits P–9 and P–8? A. It is not. Q. And has it ever been? A. I never have come across it in any of my work. Q. And that takes you how far back, Mr. Forstall? A. It takes me back to 1890. Q. Did it meet the standard of well-regulated companies in 1931? A. No, I don't think it did. Q. Did it meet the standard of well-regulated companies in 1926? A. No."

But on cross-examination the witness qualified his testimony:

"Q. You wouldn't say, would you, Mr. Forstall, that your well-regulated utility companies did not, back in the 1920's and 1930's use this L–S petcock, would you? A. I would say that I haven't come across any of them in the companies whose properties I valued. Q. But you don't say, do you, that well-regulated utility companies didn't use this L–S petcock at that time? A. I don't know."

Also, the witness suggested that defendant's system was designed for "low pressure" rather than the "medium pressure" supplied to the particular premises, as evidenced by the use of a one and a half inch service pipe, and "if it had been designed for a medium pressure, * * * there would be a curb stopcock put on it." But, so far as appears, these are wholly irrelevant factors. It is not shown that either the pressure or the absence of a curb stopcock was the proximate

cause of the mishap, either in the escape of the gas or the ensuing explosion. The curb stopcock would serve only as a more expeditious means of shutting off the flow of the gas from the main, saving the time required for excavation; but here the defendant's emergency crew did not come upon the scene until sometime after the occurrence of the explosion, although it is urged that there was a failure of duty because a curb stop "would have made it possible" for "any other person with the ability to move a curb cock by one quarter turn" to "shut off the flow of gas which caused the explosion," in the face of the admission made by defendant's own superintendent of emergency service that a curb cock could not be "opened or shut" without a "special key." And the witness Forstall finally conceded that the omission of the curb stop was not a departure from accepted standards and "the causative factor of this explosion * * * is centered at this valve cock, this petcock, Exhibit P-8." When asked on cross-examination whether it was his opinion that "this petcock deviated in any way from standard petcocks used by well-regulated utility companies in 1926, 1930 or 1935," he said: "I think it did deviate." The inquiry then was whether the deviation "is because it is of lighter construction than the petcock you brought here for us today," and he replied: "No, because it is of the construction—it had gotten corroded to such an extent that it ripped right off." He conceded that a "visual inspection" of the petcock "in position in the pipe, in its normal position," would "not reveal the condition of the core within the pipe," as respects corrosion or "any defective condition"; and that if the petcock had "moved freely" when "turned on and off three times" in the prior five years, it would seem that "there was not a condition of corrosion causing the petcock to stick."

The witness was not at all certain of the supposed knowledge offered as well founded in special and peculiar experience. Knowledge is an essential element of testimonial qualifications, and such testimony as was tendered here has no probative force unless the witness is fitted to answer on the point. The witness, himself, said he did not

know. While absolute certainty is not the standard of testimonial worth, there must needs be a showing of observation or knowledge proceeding from experience sufficient to qualify the witness to express an opinion on the subject matter. *Wigmore on Evidence* (*3rd ed.*), *sections 555 et seq.* Compare *Carbone v. Warburton*, 11 *N. J.* 418 (1953). Here, the eventual concession made by the witness would seem to be a disavowal of the requisite testimonial expert qualifications, or, at the very least, an unsureness that militates against the trustworthiness of his opinion.

 There were motions to dismiss the complaint on the ground of a want of evidence of failure of duty constituting negligence. As to the first count, the jury were instructed on plaintiff's request to "consider the evidence pertaining to the meter cock in the light" of the general rule of law that the "adoption and operation of a method which accords with that in general use by well-regulated companies and approved by experience is due performance of the duty and the care owed," but "the care which must be exercised over the construction and maintenance of a highly destructive agency requires more than the use of mere mechanical skill and approved mechanical appliances; it also includes circumspection and foresight with regard to reasonably probable contingencies." Defendant acquiesces in this statement of the principle, citing *Beck v. Monmouth Lumber Co.*, 137 *N. J. L.* 268 (*E. & A.* 1948). As to the second count, it was the exclusive province of the jury to determine whether on the evidence touching its conduct after notice of the rupture in the gas line, defendant exercised care commensurate with the risk of harm. Plaintiff adduced evidence tending to show that defendant was given notice of the mishap at 4:30 P. M., or a few minutes earlier, and that defendant's emergency crew did not reach the locus until 5:30 P. M. On the contrary, defendant's witnesses fixed the time of the notice at 5:02½ P. M., and offered its radio log in corroboration, asserting that the company's records "represent facts," while plaintiff's testimony as to time was "necessarily an approximation," and the records "should be

regarded as more accurate." But this contradiction in the proofs involves the fact-finding process committed by law to the jury. Compare *Robbins v. Thies*, 117 *N. J. L.* 389 (*E. & A.* 1937).

We shall not say more respecting the sufficiency of the evidence to sustain the counts of the complaint. A new trial is required for error of substance in the instruction directed to the issue raised by the first count.

As we have seen, the judge charged, *inter alia*, that in determining the issue of negligence "in furnishing and maintaining the meter cock from which the gas escaped," the jury should consider the evidence pertaining to that instrumentality in relation to the standards and practices of well-regulated companies and sanctioned by experience, although this was not necessarily the determinative where a highly destructive agency is involved.

Later on, the judge charged this request presented by defendant—

"Neither the consumer nor any other person has the right to disturb or interfere with the meter or any appurtenance thereon which are the property of defendant"—

modified as follows:

"I am going to qualify that, however. Where the defendant puts a stop cock, as in this case, in the plaintiff's property and does not lock that stop cock, and as in this case it could be locked closed, that is, so no gas would flow into it, if they didn't want anyone in the premises to touch that or to move it they could just as easily have locked it open, so that it could be locked either way. As it stands now, under the evidence as I recall it, the stop cock could be locked or sealed open—sealed shut so that no gas could go into the meter or into the part of the house beyond the meter, beyond the stop cock. On the other hand, if they didn't want anybody else to touch that or to move that, the company could just as easily have had an arm on it or they could have locked it around the pipe or have had it in such shape that it could have been locked so that it would be open after the company opened it."

An objection to the qualification was seasonably made. The qualification laid down a false and delusive standard of

conduct not within the issues tried. All this suggests that the failure of defendant to use appliances that would have put the stopcock beyond the reach of the plaintiff householder constituted a breach of duty actionable in tort, or that the jury might well conclude that in the particular circumstances the omission was not in keeping with the duty laid upon defendant to exercise care commensurate with the risk of harm.

Indeed, this instruction ignored the undisputed evidence, adduced by both parties, that there was no known device to lock or seal a stopcock "when the service is on." This from defendant's witness Chadwick, supervisor of its emergency service. And plaintiff's own technical expert, Forstall, said that there is no "way that this meter cock can be locked in an on position," and that is true "whether you turn it in one direction or in exactly the opposite direction."

The Appellate Division said of this instruction that "while it might well have been omitted, it was clearly not intended to be in the nature of a specific charge of a duty of the defendant to lock the meter stopcock, but was in effect, merely an observation by the court of a means that might have been adopted by the defendant to avoid the situation that occurred here and when considered in light of the entire charge to the jury, the distinction between the comment and the specific charge becomes apparent," and there was no harmful error.

We cannot concur in this assessment of an instruction that in its normal connotation imports a specific duty the performance of which would have obviated the injury. In all human likelihood it was viewed by the jury as measuring defendant's responsibility; at all events, it cannot be assumed that none of the jurors were misled. An instruction is tested by the normal sense and significance of the language—the import of the words to the lay minds comprising the jury. While a request may be modified to forestall confusion or misapprehension by the jury, the modification itself must be free of these vices. An instruction is required to be certain and definite in its terms; and

if it be so phrased as likely to mislead or confuse the jury, it subverts the function of an instruction as a compass for the guidance of that tribunal in the resolution of the issues within their province, and there can be no assurance that the verdict is well grounded in law and in fact. *Hempstead. v. Robinson,* 1 *N. J.* 32 (1948); *Kauderer v. McAllister Coal Co.,* 132 *N. J. L.* 410 (*E. & A.* 1945); *Middleton v. Public Service Coordinated Transport,* 131 *N. J. L.* 322 (*E. & A.* 1944); *Cleary v. Camden,* 118 *N. J. L.* 215 (*Sup. Ct.* 1937); *Simons v. Lee,* 117 *N. J. L.* 370 (*E. & A.* 1936); *Kargman v. Carlo,* 85 *N. J. L.* 632 (*E. & A.* 1914).

Where there is erroneous instruction in matter of substance and no proper qualification of it is to be found in the context or in the charge as a whole, there is reversible error, for the jury has not the faculty of divining the sound principle, even though it may be correctly expounded somewhere in the charge. *State v. Erie R. R. Co.,* 84 *N. J. L.* 661, 666 (*E. & A.* 1913); *State v. Linker,* 94 *N. J. L.* 411 (*E. & A.* 1920). This is axiomatic. Unless that be the rule, there can be no assurance of the integrity of jury verdicts. An instruction that has no basis in the evidence is ordinarily insupportable as tending to mislead the jury. *Kresse v. Metropolitan Life Insurance Co.,* 111 *N. J. L.* 474 (*E. & A.* 1933); *Garton v. Public Service Electric & Gas Co.,* 117 *N. J. L.* 520 (*E. & A.* 1937). If the request were deemed deficient in its statement of legal principle or was misleading or confusing in its terms, or likely to mislead or confuse, it could well have been rejected; but, having undertaken to refine the language, the judge was required to charge correctly.

The judgment is accordingly reversed, and the cause is remanded for a new trial, costs to abide the event. *Vide Lynch v. Public Service Railway Co.,* 83 *N. J. L.* 783 (*E. & A.* 1912).

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—Justice WACHENFELD—1.