754 A.2d 1137

DYNASTY, INC., T/A HOLLYWOOD LIGHTS, PLAINTIFF–
RESPONDENT, v. THE PRINCETON INSURANCE
COMPANY, DEFENDANT–APPELLANT.

Argued March 13, 200—Decided July 24, 2000

*Allan Maitlin,* argued the cause for appellant (*Sachs, Maitlin, Fleming, Greene, Wilson & Marotte,* attorneys).

*James J. Guida,* argued the cause for respondent.

The opinion of the Court was delivered by

VERNIERO, J.

In this insurance litigation, plaintiff seeks payment from defendant insurer for the loss of plaintiff's commercial premises. The

Appellate Division upheld the jury's verdict in favor of plaintiff. The sole issue before this Court is whether the trial court adequately instructed the jury. We hold that the trial court committed reversible error by failing to give an "increase-of-hazard" instruction. That instruction would have informed the jury that defendant could not be found liable for the loss if the fire hazard was increased by any means within the control or knowledge of plaintiff. In view of our holding, we remand the matter for a new trial.

## I.

In or about April 1993, Dynasty, Inc. ("Dynasty") was incorporated by two partners, Donald Esposito and Thomas Gatto (referred to collectively as "the partners"). In that same month, Dynasty purchased a restaurant known as "Antonio's" from The Fifth Man, Inc. ("Fifth Man"). Esposito's uncle, Jerry Esposito, owned Fifth Man. The restaurant was located on Bloomfield Avenue in Bloomfield, New Jersey. The purchase price was $150,000.

The partners jointly paid $60,000 of the purchase price in cash and gave Fifth Man a note for $90,000, which was payable over three years with eight percent interest. Dynasty and the two partners were liable on the note, which was also secured by a mortgage in favor of Fifth Man. An unrelated party, Henry Kopacz, owned the building that housed Antonio's. Kopacz agreed to assign Fifth Man's lease to the new owner.

Soon after the purchase, the partners made changes to Antonio's, essentially transforming it from a restaurant to a nightclub. As examples of the transformation, the restaurant's name was changed to "Hollywood Lights," and, in or about September 1993, the business started having male strippers perform at least once a month and started to serve primarily "finger foods." Hollywood Lights also began hosting non-alcoholic nights for teenagers.

Because the nature of the business had changed from a restaurant to that of a nightclub, the Bloomfield Fire Department

required that a sprinkler system be installed on the premises at a cost of about $21,000. The system was installed in April 1994. The partners had to borrow funds to help finance the installation of the sprinkler system and seemed ill-prepared financially for that additional expenditure. Conflicts soon developed between Esposito and Gatto over the direction the club should follow. Esposito wanted a more conservative establishment to cater to an older clientele, whereas Gatto favored an approach that would appeal to a younger constituency.

The nightclub also fell into financial difficulty. Dynasty was falling behind on its loan payments, its rental payments and its accounts with its liquor suppliers. Esposito had to borrow $35,000 from a friend not only to pay part of his investment but also to pay for the sprinkler system. Dynasty never paid the sprinkler installer in full, owing the installer about $5,500 at the time of the fire. By May 1994, the financial difficulties worsened. Fifth Man, the mortgage holder, was threatening to foreclose on its mortgage and Esposito and Gatto fell further behind on the loan payments. Jerry Esposito, on behalf of the mortgagee, agreed to refinance the loan if Gatto would terminate his interest in the business. Gatto, in exchange for resigning his position with Dynasty, was released from the loan and formally resigned from the company on May 13, 1994.

With Gatto's departure, Esposito alone owned the business and ran it with help from his uncle, Jerry Esposito. Soon after Gatto left, in the weeks immediately prior to the fire, Donald Esposito changed the front door locks to the building, installed a new tile floor, repainted the inside and outside of the building, and restocked the liquor inventory.

The fire that destroyed Hollywood Lights occurred in the late evening of Sunday, June 5, 1994. According to expert testimony, the fire was intentionally set. A witness in a neighboring building testified that he heard a "roar" and that the floor beneath him shook. When he walked outside, the witness observed an unidentified blue van coming from Hollywood Lights at a high rate of

speed. When firefighters arrived, they entered the building by prying open a locked, undamaged front door. That arson was the cause of the blaze appeared obvious: firefighters found three five-gallon gasoline containers in the nightclub and noticed a strong smell of gasoline. The parties do not dispute arson as the cause of the fire.

Donald Esposito testified that he was at the movies when the fire started. He stated that he was last at Hollywood Lights on the morning of the day of the fire to look for his jacket. Esposito stated further that on his way home from the movie theater, after stopping for coffee, he drove in the direction of his residence and the club. He stopped because of the commotion and then was told that Hollywood Lights was ablaze. Esposito spoke briefly with fire investigators that evening.

The sprinkler system was found chain-locked in the "off" position at the time of the fire, thus preventing it from activating. At the time the local fire department had approved the system in April 1994, the system's control valve was locked in the "on" position. Esposito testified that the key for the valve was kept nearby in the event that someone, presumably a patron, intentionally activated the sprinkler with a cigarette lighter.

Dynasty maintained fire insurance pursuant to a policy issued by the Princeton Insurance Company ("Princeton"). Due to the fire, Hollywood Lights sustained damages in the approximate amount of $244,000, which exceeded the $150,000 coverage limit in Dynasty's policy. Dynasty made a claim to Princeton for payment up to the full amount of coverage. Pursuant to the terms of the policy, the insurer required that Esposito submit to an examination under oath. During that examination, Esposito denied any complicity or knowledge in the setting of the fire and specifically denied under oath that he had turned off the sprinkler system. He admitted being in the building earlier on the day of the fire, when the building was closed, but denied bringing gasoline onto the premises.

Princeton denied the claim on the basis of its belief that the insured ordered or acquiesced in the setting of the fire. Thereafter, Dynasty instituted this action, which was tried before a jury in January 1998. Esposito testified at trial concerning the sprinkler system and his purported lack of knowledge concerning the arson, essentially mirroring his previous testimony submitted to the insurer. Princeton's theory at trial was that Esposito set the fire, or facilitated it by disabling the sprinkler system, to obtain the insurance proceeds and thus alleviate his financial burdens. The insurer supported that allegation by eliciting testimony about Dynasty's business dealings and Esposito's personal debts and by arguing that the former partner, Gatto, had· nothing to gain from the arson because he had relinquished all interest in the business.

Dynasty rebutted defendant's theory by arguing that Gatto had a key to the building and may have set the fire himself as an act of vengeance. Esposito further testified that he did not increase the value of the insurance policy although he was given the chance to do so. He also asserted that although the business was in financial distress, he was working to make the club successful. (In summarizing the position of each side, we do not intend to imply wrongdoing on anyone's part.)

Dynasty's insurance policy from Princeton contains the following provision:

> Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring .... while the hazard is increased by any means within the control or knowledge of the insured....

That "increase-of-hazard" clause is standard language required by statute, *N.J.S.A.* 17:36–5.20. Pursuant to that provision, Princeton requested that the trial court instruct the jury that the insurance company would not be liable "for loss occurring while the hazard is increased by any means within the control or knowledge of the insured." More specifically, Princeton wanted jurors to be instructed that, "[i]f you find that the sprinkler system had been turned off, without justifiable reason by means within the control or knowledge of the insured through its officers or principals,

there is no coverage as the same was suspended and you must find for the defendant."

The trial court rejected Princeton's requested charge. Instead, the court instructed jurors that

if you find that the fire in this matter was brought about by or at the direction of or with the knowledge, consent, or acquiescence of the named insured, through its officer, Don Esposito, then there is no coverage under the insurance policy in this case.

A verdict sheet with a question similar to that instruction was also given to the jury. In rejecting Princeton's requested charge, the trial court explained that the proposed instruction was "in essence duplicative" of the charge that was given, "since any turning off of the sprinkler system by the plaintiff or anyone on his behalf regardless of whether an increase to hazard would have been a breach of the contract, because he would have started the fire in so doing." The court further noted: "It [disabling the sprinkler] would be part of the arson as far as I'm concerned. And if he [Esposito] interfered with the sprinkler system, knowing that there was going to be a fire, it's the same as if he lit it as far as I'm concerned."

After brief deliberations, the jury returned its verdict in favor of Dynasty. The trial court entered judgment against Princeton in the amount of $150,000 on January 23, 1998. Before the Appellate Division, Princeton argued that the trial court's failure to deliver the insurer's requested instruction constituted reversible error. In an unreported opinion, the Appellate Division affirmed, concluding that the trial court's charge, when read as a whole, correctly framed the factual issues to be decided by the jury. The panel was unpersuaded that the insurer's proposed charge was required because, the court reasoned, defendant's case .

was tried on the theory that Donald set the fire or intentionally facilitated the arson by locking off the sprinkler system. Thus, if Donald had turned off the sprinkler system, defendant did not have to pay under its policy. There was no evidence to suggest that Donald had deactivated the system negligently or for some purpose unrelated to the arson.

The Appellate Division also addressed other contentions of defendant, not pertinent to this appeal. We granted Princeton's peti-

tion for certification, 162 *N.J.* 198, 743 *A.*2d 850 (1999), solely to resolve the increase-of-hazard question. We now reverse.

## II.

To resolve this dispute, we must answer four related questions: Does an intentionally-disabled sprinkler system constitute an increase of hazard? Was the charge given by the trial court duplicative of Princeton's proposed charge? Was there a basis in the evidence to sustain a separate increase-of-hazard charge? If that charge should have been given, did the court's failure to deliver the charge constitute reversible error?

## A.

We first consider whether an intentionally-disabled sprinkler system constitutes an increase of hazard within the meaning of the statute. The Appellate Division in *Industrial Development Associates v. Commercial Union Surplus Lines Insurance Co.*, 222 *N.J.Super.* 281, 291–92, 536 *A.*2d 787 (App. Div.), *certif. denied*, 111 *N.J.* 632, 546 *A.*2d 546 (1988), succinctly summarized the law in this area:

"An increase in hazard takes place when a new use is made of the insured property, or when its physical condition is changed from that which existed when the policy was written, and the new use or changed condition increases the risk assumed by the insurer." [8 George J. Couch, *Cyclopedia of Insurance Law* § 37A:291, at 329 (Mark S. Rhodes ed., 2d ed. rev. vol.1985)]. An increase of hazard will generally not be found if there has been merely ". . a casual change of a temporary character." *Id.* at 330. Thus, the negligence of the insured does not constitute an increase in the hazard, unless that negligence results in a change of some duration of the structure, use or occupancy of the premises. *Orient Ins. Co. v. Cox,* [218 Ark. 804, 238 *S.W.*2d 757, 761–62 (Ark.1951)]; *Couch, supra,* § 37A:280 at 316. Whether there has been an increase of hazard suspending coverage under a policy is a question of fact which should be determined by a jury unless the evidence is so conclusive that reasonable minds could not differ. *Orient Ins. Co. v. Cox, supra,* 238 *S.W.*2d at 762; *Couch, supra,* § 37A:302 at 346. Moreover, the insurer bears the burden of proving that the insured has increased the hazard. *Couch, supra* at § 37A:305 at 352.

In applying those tenets, we must decide whether a sprinkler system locked in the off position represents a "new use" of the insured's property or a "changed condition" that has increased the

risk assumed by the insurer. Although New Jersey courts have addressed the increase-of-hazard issue in other contexts, we have found no case addressing the issue on facts similar to those presented here. See, for example, *Brighton v. N. River Ins. Co.*, 106 *N.J.L.* 10, 13, 147 *A.* 481 (Sup.Ct.1929) (finding no increase of hazard in connection with vacant house that was prepared to be moved to another foundation because house was in that condition when policy was issued); *Hodge v. Travelers Fire Ins. Co.*, 16 *N.J.Super.* 258, 84 *A.*2d 552 (App.Div.1951) (observing that sixth bedroom may have increased hazard when house was warranted to have five bedrooms; ultimate question whether insured exercised control over hazard was for jury to decide); *Asbell v. Pearl Assurance Co.*, 59 *N.J.Super.* 324, 157 *A.*2d 728 (App.Div.1960) (finding an insured's failure to clean up debris may increase hazard sufficient to suspend insurance coverage); *Vinik v. Niagara Fire Ins. Co.*, 112 *N.J.L.* 462, 466, 171 *A.* 555 (Sup.Ct.1933) (sustaining increase-of-hazard charge in connection with storage on premises of potentially "explosive" alcohol), *aff'd*, 113 *N.J.L.* 406, 174 *A.* 753 (E. & A.1934).

Courts in other jurisdictions have addressed the question whether to suspend an insurance policy when confronted with proof that the insured has disabled or otherwise failed to repair a sprinkler system. In those cases, however, the insured was responsible for maintaining the sprinkler system pursuant to a specific sprinkler provision. *See* Wade R. Habeed, Annotation, *Construction and Application of Automatic Sprinkler Provision in Fire Insurance Policy*, 79 *A.L.R.*3d 539 (1977). The only specific language in Dynasty's policy relating to a sprinkler system permits the insurer to deny payment for any loss caused by "sprinkler leakage," provided the building has been vacant for "60 consecutive days before that loss" and the insured has failed to "protect[ ] the system against freezing[.]" That language appears inapplicable on the present facts.

We have found one reported case that implicitly holds that an increase-of-hazard clause will suspend coverage when an insured

is found to have disabled a sprinkler system. In *Commercial Union Insurance Co. v. Taylor,* 169 *Ga.App.* 177, 312 *S.E.*2d 177, 178 (1983), an employee of a farm supply store turned off the master valve of the sprinkler system because the sprinkler had been leaking water, which in turn had damaged some feed. The policy at issue contained an increase-of-hazard provision. The insured also was given a reduced premium because of the existence of the sprinkler system and was required in exchange for the reduced rate to "exercise due diligence" in maintaining the system. *Id.* at 179. The employee did not inform the insured that he (the employee) had turned off the system until two weeks after the fire had occurred. *Ibid.* The insurer denied the insured's claim on the basis of the increase-of-hazard clause and because of the insured's alleged failure to maintain the sprinkler system.

The trial court found that the insured had no knowledge that "the sprinkler had been turned off until after the fire had started." *Ibid.* The court further found that the insured "visually inspected the sprinkler system on a periodic basis" and thus properly maintained it. *Ibid.* On those facts, the court entered judgment in favor of the insured. The appeals court affirmed, accepting the trial court's finding that the increase of hazard was not within the knowledge or control of the insured within the meaning of the clause. *Id.* at 180. That holding clearly implies that if an insured knows about or participates in the shutting off of a sprinkler system, the insured may be denied coverage under a standard increase-of-hazard clause.

With the exception of *Taylor,* there are few cases to guide us and none directly on point in New Jersey. Nor have we been presented with or found any case whose holding would logically preclude us from concluding that an intentionally-disabled sprinkler system might constitute an increase of hazard within the meaning of *N.J.S.A.* 17:36–5.20. Nor is there any legislative history to aid us in disposing of the question. That said, we can discern no reason to exclude from the purview of an increase-of-hazard clause an insured who unjustifiably disables a sprinkler

system using any method directly within the insured's knowledge or control. In our view, an insured who acts in such a manner has forfeited or suspended the underlying insurance policy as contemplated by the statute.

That Dynasty's policy fails to denominate specifically a disabled sprinkler as an increase of hazard is not dispositive. By design, increase-of-hazard clauses are stated in general terms because parties to an insurance contract cannot with certainty spell out every possible scenario that may lead to an increase of hazard. In that regard, one legal commentator has observed:

> The standard fire insurance policy and many other kinds of property insurance policies state that the insurer shall not be liable for loss occurring "while the hazard is increased by any means within the control or knowledge of the insured." This clause can be viewed as a modern-day warranty. Instead of including a laundry-list of situations in which insureds would forfeit coverage if they failed to take certain risk-reducing measures, insurers now state that insureds lose coverage in the event the hazard is increased. Such a condition is eminently reasonable; even if this provision were not set forth in an insurance policy in express terms, it would be an implied term in the policy that the insured could not do anything to materially increase the risk during the policy's term without forfeiting the coverage.
>
> [Robert H. Jerry, II, *Understanding Insurance Law* § 62B, at 375 (2d ed.1996) (footnote omitted).]

Consistent with those observations, we are persuaded that an insured's unjustified disabling of a sprinkler system falls within the realm of an increase-of-hazard clause. Accordingly, coverage will be suspended pursuant to that clause provided the insurer proves the insured's conduct to the satisfaction of the jury.

## B.

We next address whether Princeton's proposed charge would have been duplicative of the charge given by the trial court. In its charge, the trial court asked the jury to determine whether the fire "was brought about by or at the direction of or with the knowledge, consent or acquiescence of the named insured"—in other words, whether the insured committed arson. In contrast, Princeton's charge would have asked jurors to determine whether "the sprinkler system had been turned off, without justifiable

reason by means within the control or knowledge of the insured through its officers or principals[.]"

Of course, one cannot take steps to commit arson without also increasing the risk of fire. *See Raphtis v. St. Paul Fire & Marine Ins. Co.*, 86 *S.D.* 491, 198 *N.W.*2d 505, 507 (1972) (holding that an insured's "wilful burning of the property," if proved, would suspend insurance policy pursuant to standard increase-of-hazard clause). However, the acts necessary to accomplish arson may be different from the steps that one would take to disable a sprinkler system. Both forms of conduct could increase the risk of hazard and each might result in the same loss; however, they are factually distinct and thus give rise to separate jury determinations.

In his authoritative treatise, John Appleman provides model jury charges for use in insurance litigation, including separate charges relating to arson and increase of hazard. 22A John Alan Appleman and Jean Appleman, *Insurance Law and Practice* § 13874, at 67 and § 13969, at 99 (1979). Significantly, Appleman's specific arson charge is different in text from his more general increase-of-hazard charge, the former focusing on whether the insured "willfully set fire" to the premises, Appleman and Appleman, *supra*, § 13874, at 67, and the latter centering on whether the "fire hazard was increased by any means within the control or knowledge" of the insured, similar to the text of the clause at issue here. Appleman and Appleman, *supra*, § 13969, at 99. Given the distinctive nature of committing arson as compared to disabling a sprinkler, the trial court was mistaken in treating the two concepts as one for purposes of its charge to the jury.

## C.

Having concluded that the trial court's arson charge was not duplicative of Princeton's requested charge and, further, that disabling a sprinkler system may constitute an increase of hazard, we now must determine whether there was a basis in the evidence to require a separate charge in this case. "A jury

instruction that has no basis in the evidence is insupportable, as it tends to mislead the jury." *Lesniak v. County of Bergen*, 117 *N.J.* 12, 20, 563 *A.*2d 795 (1989) (citing *Guzzi v. Jersey Cent. Power and Light Co.*, 12 *N.J.* 251, 260, 96 *A.*2d 387 (1953)).

We have closely reviewed the trial record and conclude that a sufficient basis existed to support Princeton's requested charge. The lawyers for each side referred to the sprinkler system in their respective opening statements to the jury. Dynasty's counsel stated:

> You're going to hear the term that it was arson, that it was sloppy arson in the sense that there was [sic] gasoline cans all over the place and you're also going to hear that there is no forced entry ..., that whoever started the fire either had a key, was able to gain entry without breaking the door down.

> And after an investigation later on, there was [a] question as to whether the sprinkler system was functioning at all and the bottom line is that what Don Esposito is going to testify to you is his partner had a key. He had problems with his partner after he threw his partner out. His partner had kept coming back to the restaurant and to the nightclub and they had some words.

Princeton's counsel stated in his opening statement:

> The fire occurs on a Sunday evening. It didn't appear to be forced entry. Interesting enough the sprinkler system has a valve which turns it on and off and obviously you're suppose to leave the sprinkler system on. It was found locked in the off position. This fire was started by a series of pouring gasoline. It was— almost an explosion occurred. There was almost an explosion. There was no one that had anything to gain from this fire except the owners of Dynasty— the owners of that night club.

Donald Esposito was the first witness to testify. On direct examination, he testified at length about the discussions with his uncle that led to the purchase of the business, the terms of the transaction, his relationship with his partner, the financial pressures on the business, and his whereabouts on the night of the fire. He also specifically testified about the sprinkler system, including details concerning the location of the system within the restaurant and how the system was controlled. In his exchange with counsel, Esposito stated:

> Q. Now getting back to my question about the sprinkler system. Where was the main control for the sprinkler system?

A. The main control was in the back room in an old D.J. booth. There was a little booth maybe the size of 4 × 4 and there was a sliding window, I guess that the D.J. would use [to] hand records back and forth when it used to be a D.J. booth.

Q. And what was inside that room?

A. Inside that room was the control for the sprinkler system.

Q. Can you describe the control?

A. It was a—almost like—it looked like on a ship, one of those big turn wheels.

Q. Was there an on/off position?

A. I don't really know. I never really did anything.

Q. Was there a chain or a lock to it?

A. There was a chain that would go on the sprinkler system and there was a key to the chain that we kept right next to the system just in case. See, our ceilings were very low. I think they were about eight feet and we had instructed the workers in case it ever, you know, someone just held a lighter up to the ceiling it could put the sprinkler system off so we had kept the key there in case it ever went off that any worker could unchain it and I guess, turn the position.

Q. While you were operating, did the sprinkler system ever go off at all?

A. No, it did not.

Q. Did you ever turn the sprinkler system into the off position?

A. No, I did not.

On cross-examination, Esposito was asked to draw a diagram for the jury to indicate the location of the sprinkler controls. He did so. He also testified:

Q. All right. Were you aware that there was a valve in the D.J. booth to turn the sprinkler on and off?

A. Yes, I was.

Q. All right. I think you testified before that you—there was a key there at the main valve. Is that correct?

A. Yes.

Q. And that was in case someone put a cigarette on the sprinkler and it started accidentally?

A. If the sprinkler went off, then someone could shut it off.

Q. And everyone—all the employees were instructed that if something like that happens to immediately go and shut it off?

A. I believe so.

Q. And they knew where the key was so that they could unlock the chain that kept it open?

A. Yes.

Q. All right. And what we're talking about is just a simple valve that you turn. Is that correct?

A. Yeah. It was like a wheel that would turn.

Q.  Okay. And to your knowledge, you never turned it on or off?

A.  No. I never turned it on or off.

Esposito further testified on cross-examination that there was a lock on the room that housed the sprinkler controls but that the room was "normally kept open and there was a window also where the old D.J. booth was so that at any time, you could just slide the window that had no lock and just go in and open the door, even if it was locked." Esposito also noted that he was sometimes in the room to "put kegs of beer in there" and other supplies and that he may have "inadvertently" touched the control wheel to the sprinkler but he maintained that he "never turned the wheel."

The first defense witness to testify was the insurer's investigator who inspected the scene on June 14, 1994, about one week after the fire. The investigator testified that in his opinion the fire was intentionally set. He also testified concerning the sprinkler system. Specifically, the investigator explained to the jury the workings of the sprinkler control valve, describing it as "a big screw, it comes way out so you can very quickly look at this and know whether it's on or off." Referring to a photograph of the valve itself, the witness testified: "In this particular case, that sprinkler control valve is off and it's also chained."

A senior fire prevention specialist employed by the Bloomfield Fire Department also testified on behalf of defendant. The specialist testified that he inspected the sprinkler system when it was first installed in 1994. Specifically, the specialist stated that when he inspected the system the valve was locked in the open position. He testified that "it was locked [in the open position]. I would not have approved it unless it was locked."

As previously noted, at the charge conference before counsel gave their respective closing statements, the trial court determined that it would not charge the jury as requested by Princeton. Nonetheless, counsel for the insurer made mention of the sprinkler system in his closing statement:

Not only was there not forced entry, it had to be someone with a key. But also the sprinkler system. [The Bloomfield Fire Department inspector], when he looked at

that system and inspected it months before, it was locked in the open position and now it's locked in the off position.

Could somebody from the outside have done it? Sure. It's possible but we're dealing with probabilities and the probabilities are someone from the inside. This was planned by more than one person. I don't know whether Don [Esposito] was there or not, but I strictly contend that it could not have been done without the acquiescence, without the understanding of the owner, of the principal of that business. That was an inside job.

We are satisfied, viewing the record in its entirety, that defendant's theory at trial was that plaintiff or its agents participated in the arson and that Donald Esposito or someone on his behalf disengaged the sprinkler system, thereby increasing the risk of hazard. That was the insurer's theme throughout its presentation to the jury. Defendant opened its case by referring to the sprinkler system and called or questioned numerous witnesses who testified about that system. We have to assume that, but for the trial court's refusal to administer Princeton's proposed charge, defense counsel would have said more about the sprinkler system in his closing statement.

Moreover, jurors heard testimony about precisely where the sprinkler system was located, how it operated, and the accessibility of the control valve to Esposito and other employees of the business. The jury also heard that when the Bloomfield Fire Department inspected the system the central valve was locked in the open position and then, at the time of the fire, the valve was locked in the off position. Although we do not decide ourselves whether Dynasty or its agents were in any way responsible for the arson or in disabling the sprinkler system, we conclude that there was a sufficient basis in the record to present both questions to the jury. Thus, the trial court erred in instructing the jury solely on arson.

## D.

We turn to the final question, namely, whether the trial court's error warrants a new trial. Although defense counsel submitted an increase-of-hazard charge to the trial court, which the court rejected, the record does not indicate that counsel

objected to the final charge as required by *Rule* 1:7–2. Accordingly, we have considered the charge under the plain-error standard. *R.* 2:10–2; *Nesta v. Meyer,* 100 *N.J.Super.* 434, 443–44, 242 *A.*2d 386 (App.Div.1968) ("The fact that a party has submitted a timely request to charge, does not ordinarily dispense with the obligation ... to object to the trial judge's omission to so charge."). Plain error is defined as "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970).

We conclude that the trial court's rejection of Princeton's charge constituted plain error. Because Princeton's increase-of-hazard instruction represented an entirely separate defense, its omission by the trial judge unjustly denied the insurer an alternative basis on which to defend this action. As noted, whether there has been an increase of hazard suspending an insurance policy is a question of fact to be determined by a jury. *Industrial, supra,* 222 *N.J.Super.* at 282, 536 *A.*2d 787. Because that question was not submitted to the jury, a new trial is required.

## III.

We emphasize that this is an idiosyncratic case. The more typical application of an increase-of-hazard clause involves some change in the physical condition of the property or some new use that is alleged to have increased a hazard that did not exist prior to the issuance of the policy. *Industrial, supra,* 222 *N.J.Super.* at 291–92, 536 *A.*2d 787. We also reiterate that casual, temporary changes generally do not amount to an increase of hazard, nor does the negligence of the insured constitute an increase of hazard "unless that negligence results in a change of some duration of the structure, use or occupancy of the premises." *Ibid.*

Our holding today is dictated as much by common sense as by a straightforward reading of the statute. *See Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 365, 390 *A.*2d 606 (1978) (Pashman, J., dissenting) (extolling virtue of "test of common sense" in resolving disputes). By plain logic, an insured who is alleged to have disabled a sprinkler system may be found on sufficient proofs to have increased the hazard by changing the condition of the premises using means within his or her control or knowledge. We cannot fathom that the Legislature would have intended a contrary conclusion in mandating the increase-of-hazard clause in policies like the one issued to Dynasty. In other words, we are persuaded that Princeton did not assume the risk that a sprinkler system required by the local fire code would be chain-locked in the off position at the time of this fire. Accordingly, the insurer was entitled to have the jury consider whether the increase-of-hazard clause in Dynasty's policy operated to suspend coverage on the record presented.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for further proceedings.

LONG, J., dissenting.

I am in complete agreement with the majority's crystalline clarification of the previously murky law of increase-of-hazard. I part company from my colleagues only insofar as they have concluded that this record warrants a reversal. Like the trial court and the Appellate Division, I do not find an evidential basis for an increase-of-hazard instruction.

There is no direct evidence that Esposito or anyone "under his control or with his knowledge" ever locked the sprinkler system in the off-position. In fact, the only evidence is that, except during the actual fire, the sprinkler system was locked in the on-position, shown by the fact that Esposito left a key for his employees so they could momentarily turn off the system if it was activated

accidentally (by a smoker for example). Obviously, if the system was locked in the off-position, no key would have been necessary. Given the absence of any direct evidence of Esposito's complicity in locking the sprinkler system, it was his financial motive that got the arson case to the jury. As the majority properly notes, "Princeton's theory at trial was that Esposito set the fire or facilitated it by disabling the sprinkler system to obtain the insurance proceeds and thus alleviate his financial burdens." *Ante* at 7, 754 *A*.2d 1140. A thin circumstantial case pivoting off financial motive was advanced on that point. There was, however, no evidence, circumstantial or otherwise, that Esposito (or anyone in his control or with his knowledge) locked the system in the off-position for a reason other than to facilitate the arson. That missing proof is what would have been necessary to justify an increase-of-hazard instruction.

The possibilities here are that Esposito locked the sprinkler system in the off-position to facilitate an arson; locked it for a different purpose, thus increasing the hazard; or did not lock it at all. Only the first and last of those scenarios can fairly be inferred from the record. The reason the trial court refused the increase-of-hazard instruction was because the trial, at heart, had been about arson; the court recognized that there was no separate evidence to support another theory of defense. As the Appellate Division aptly observed, Princeton's case

> was tried on the theory that [Esposito] set the fire or intentionally facilitated the arson by locking off the sprinkler system. Thus, if [Esposito] had turned off the sprinkler system, defendant did not have to pay under its policy. There was no evidence to suggest that [Esposito] had deactivated the system negligently or for some purpose unrelated to the arson.

That is not to suggest locking the sprinkler could not constitute an increase-of-hazard, or that arson and increase-of-hazard can not exist simultaneously in a single case. For example, an insured who deliberately locks a sprinkler system for a purpose other than arson can be denied coverage on increase-of-hazard grounds. Likewise, if there had been evidence in this case, in addition to the arson evidence, that Esposito or an employee locked the sprinkler

system in the off-position to save them the trouble of disengaging it if it accidentally activated, both an increase-of-hazard charge and an arson instruction would have been necessary. However, there was no such evidence here; thus the arson charge alone was adequate.

I would affirm the Appellate Division and allow Esposito's verdict to stand.

*For reversal and remandment*—Chief Justice PORITZ, and Justices O'HERN, STEIN, COLEMAN, VERNIERO and LaVECCHIA—6.

*For affirmance*—Justice LONG—1.